**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

AUDUBON NATURALIST SOCIETY OF   *
THE CENTRAL ATLANTIC STATES, INC.,  *
 *et al.,*                               *

        Plaintiffs,            *

                                   *

        v.                     *     Civil Action No. AW-06-3386

                                   *

UNITED STATES DEPARTMENT OF     *
TRANSPORTATION, *et al.*,        *

                                 *

        Defendants.         *

_____   *

ENVIRONMENTAL DEFENSE, *et al.*    *

                                 *

        Plaintiffs,           *

                                 *

        v.                     *     Civil Action No. AW-07-1480
                                 *        (Consolidated)

UNITED STATES DEPARTMENT OF     *
TRANSPORTATION, *et al.*,        *

                                 *

        Defendants.         *

                                 *

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

## MEMORANDUM OPINION

Presently before this Court are cross-motions for summary judgment.  Plaintiffs Audubon Naturalist Society of the Central Atlantic States, Inc. ("Audubon"), Maryland Native Plant Society, Inc., Roger Metcalf, and Eve Burton (collectively "Audubon Plaintiffs" or "Plaintiffs"[1]) filed a Motion for Summary Judgment (Doc. No. 28) on June 8, 2007.  Plaintiffs Environmental Defense

---

[1] The Audubon and Environmental Defense Plaintiffs raise very similar claims in their motions for summary judgment.  Therefore, considering that the two cases have been consolidated and to prevent confusion of the parties, the Court will often refer to both parties collectively as "Plaintiffs."

and Sierra Club, Inc. (collectively "Environmental Defense Plaintiffs" or "Plaintiffs") filed a Motion

for Partial Summary Judgment on Part I of the Complaint (Doc. No. 37) on July 2, 2007.

Defendants United States Department of Transportation ("USDOT"); Mary E. Peters, Secretary of

Transportation; Federal Highway Administration ("FHWA"); J. Richard Capka, Administrator of

FHWA; Nelson Castellanos, Division Administrator of FHWA, Maryland Division; United States

Army Corps of Engineers ("USACE"); Col. Peter W. Mueller, Commander and District Engineer

of USACE, Baltimore District; and Janet M. Vine, Chief, Regulatory Branch of USACE, Baltimore

District (collectively "FHWA" or "Defendants"[2]) filed a Cross-Motion for Summary Judgment and

Opposition to the Audubon Plaintiffs' Motion for Summary Judgment and the Environmental

Defense Plaintiffs' Partial Motion for Summary Judgment (Doc. No. 43) on August 17, 2007.

Intervenor-Defendant, State of Maryland, also filed a Cross-Motion for Summary Judgment, Cross-

Motion for Partial Summary Judgment, and Opposition to Plaintiffs' Motion for Summary Judgment

and Motion for Partial Summary Judgment (Doc. No. 44) on August 17, 2007.  On October 1, 2007,

the Court conducted a hearing regarding the above Motions.  *See* Local Rule 105.6 (D. Md. 2004).

Also before the Court is Environmental Defense Plaintiffs' Motion for Summary Judgment

on Part II of the Complaint (Doc. No. 42), filed on August 17, 2007.  On September 14, 2007, both

the Federal Defendants and the Intervenor-Defendant, State of Maryland, filed a Cross-Motion for

Summary Judgment on Part II of the Environmental Defense Plaintiffs' Complaint (Doc. Nos. 49

and 50).  The Environmental Defense Plaintiffs filed its response to Defendants' cross motion on

October 1, 2007.  The Court conducted a hearing on these motions on October 29, 2007.  *See* Local

Rule 105.6 (D. Md. 2004).  The Court also allowed supplemental briefing with respect to the

---

[2] The word "Defendants" will be used throughout this opinion to refer to both the Federal Defendants and the Intervenor-Defendant, State of Maryland.

Environmental Defense Plaintiffs' Motion to Supplement Complaint (Doc. No. 61). Therefore, also before the Court are the Environmental Defense Plaintiffs' Motion for Summary Judgment on Counts 39 and 41 (Doc. No. 73) and the Federal Defendants' and Intervenor-Defendant State of Maryland's Joint Cross-Motion for Summary Judgment on Plaintiffs' Supplemental Claims (Doc. No. 76). No hearing was deemed necessary on these supplemental motions. *See id.*

The Court has also reviewed the *amicus* brief filed by the Prince George's County Elected Officials and has also taken into consideration their arguments advanced during the hearing on October 1, 2007.

## I.  BACKGROUND[3]

The Audubon Plaintiffs commenced this action for injunctive and declaratory relief on December 20, 2006, pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA") and its regulations; the Department of Transportation Act of 1966, 49 U.S.C. § 303 ("Section 4(f)"); the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. ("APA"); and the Clean Water Act, 33 U.S.C. § 1344 ("CWA"). The Audubon Plaintiffs seek injunctive and declaratory relief relating to FHWA's approval of a proposed highway project, the Intercounty Connector ("ICC"), which connects I-95/US 1 in Prince George's County, Maryland and I-270 in Montgomery County, Maryland. Plaintiffs claim that in reaching the decision to approve the ICC, Defendants did not adequately discharge various statutory duties.

Plaintiffs Environmental Defense and Sierra Club, Inc. also challenge the ICC project and seek both injunctive and declaratory relief. They commenced their action in the United States District Court for the District of Columbia on June 5, 2007, pursuant to the Safe, Accountable,

---

[3] The Administrative Record ("AR") exceeds 300,000 pages and spans over 40 years. The Court describes here only those portions of the record that pertain to the Plaintiffs' primary legal arguments.

Flexible, Efficient Transportation Equity Act: A Legacy for Users, 23 U.S.C. § 134 ("SAFETEA-LU"); the Federal-Aid Highways Act, 23 U.S.C. § 109 ("FAHA"); the National Environmental Policy Act, 42 U.S.C. §§ 4321-70(f) ("NEPA"), the Administrative Procedures Act, 5 U.S.C. §§ 701-06 ("APA"); and the Clean Air Act, 42 U.S.C. § 7604 ("CAA").  The Environmental Defense Plaintiffs' case was transferred to this Court on June 5, 2007.  The two related cases –

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc., et al. v. U.S. Dep't of Transp, et al.* (06-cv-3386) and *Envtl. Def., et al. v. U.S. Dep't of Transp. et al* (07-cv-1480) – have been consolidated.

### A.  Brief Overview of the Inter-County Connector

Over half a century ago, an east-west highway across the middle of Montgomery County and into western Prince George's County was proposed as part of a larger Outer Beltway around Washington, D.C.  FHWA 182676 (Administrative Record).  Although the concept of an Outer Beltway was dropped, the plan to build this east-west highway remained and has now developed into the project currently in dispute, the Inter-County Connector ("ICC"). *Id.*

The ICC, which will be designated as Maryland Route 200, is a controlled access highway with eight interchanges, extending approximately eighteen (18) miles from I-370/I-270 near the Shady Grove Metrorail Station in Montgomery County to I-95/US 1 in Prince George's County.  FHWA 182680.  Approximately sixteen of the eighteen miles are located in Montgomery County and approximately two miles are in Prince George's County.  *Id.*  The ICC was proposed in response to the need for increased mobility and transportation safety in the study area serviced by the ICC project, and is predicted to provide a high-speed, free-flow transportation option to up to 300,000 people per day.  FHWA 183090.

The ICC has been an integral part of the comprehensive plans for Montgomery and Prince

4

George's Counties for decades.  *See* FHWA 141888.  It will achieve mobility, safety, and "smart growth" objectives, and is one of the many elements of the land use and transportation plans for the Counties, the State, and the region.  *See* FHWA 141891.  This transportation project is intended to increase community mobility and safety; to facilitate the movement of goods and people to and from economic centers; to provide a cost-effective transportation infrastructure to serve existing and future development patterns reflecting local land use planning objectives; to help restore the natural, human, and cultural environments from past development impacts in the project area; and to advance homeland security.  FHWA 141941.

### B.  History of the ICC Study Area

Beginning in 1953, the concept of the ICC was incorporated into the seminal 1964 General Plan for the Maryland-Washington Regional District, entitled "On Wedges and Corridors."[4]  FHWA 141888.  In 1968, both Montgomery County and Prince George's County rejected the outer beltway concept.  *Id.*  Nevertheless, in 1972, Montgomery County approved the proposed ICC alignment between I-270 in Montgomery County and I-95 in Prince George's County.  *Id.*  The ICC was dropped from Prince George's County Master Plans with the adoption of the 1982 Prince George's County General Plan, but was reintroduced in Prince George's County in 1990 with the Subregion I Plan.  FHWA 141888.

### C.  Past Project Planning Studies

---

[4] The concept of "On Wedges and Corridors" included a regional vision of future growth areas and open space areas.  The plan directed that future growth be focused in developed and developing areas, along highway and rail corridors, and that wedges of farmland, rural spaces and low-density residential uses provide breathing room between denser growth centers.

There has been extensive public debate over the ICC, which is best reflected by the fact that the project has been the subject of three separate Federal NEPA studies, only the current of which resulted in the completion of the process to a Final Environmental Impact Statement ("FEIS") and a Record of Decision ("ROD").  FHWA 182676.  Prior to the current study, the FHWA and the Maryland State Highway Administration ("SHA") published Draft Environmental Impact Statements ("DEIS") and conducted public hearings in 1983 and again in 1997.  FHWA 182677.

The first NEPA analysis of an ICC commenced in 1979, and a DEIS was published on July 8, 1983.  AR 141889.  The second attempt at an ICC study commenced in 1991, and a DEIS was published on March 3, 1997.  *Id.*  Neither study proceeded beyond the preliminary stage. Both times, the studies were abandoned due to concerns expressed by the reviewing agencies over potential environmental concerns and political controversy regarding the location of the highway.  FHWA 141889, 182677.

In 1998, as a result of the failed attempts to construct the ICC, then-Governor Parris Glendening appointed the Transportation Solutions Group ("TSG"), a panel of national and local experts on transportation and land use, to investigate mobility and smart growth issues for the bi-county region and develop solutions for multi-modal transportation approaches.  FHWA 141889. Among those recommended solutions was a demonstrated need for a new, east-west, value-priced (i.e., tolled), limited access highway connecting Montgomery and Prince George's Counties. FHWA 141890.

**D.  The Development of the Current ICC Study**

6

In September 2002, President George W. Bush issued Executive Order ("EO") 13274,[5] which included the formation of a task force to monitor the progress of selected priority projects and to examine policy issues that promote efficient interagency coordination and improved environmental decision making.  FHWA 182667.  In 2003, then-Governor Robert Ehrlich decided to resurrect the proposed ICC, naming it his "number one transportation priority."  FHWA 078193.  The ICC was later selected by the United States Department of Transportation ("USDOT") Secretary Norman Mineta as one of the first nationwide proposals to be monitored by the task force.  *Id.*

After repeatedly being rejected by the agencies in their previous attempts to build the ICC, Defendants went back to the drawing board to consider the concerns expressed by the agencies.  On June 11, 2003, Defendants commenced the current NEPA study.  Pursuant to the Executive Order, the current study focused on early and continuous coordination with twenty-one (21)  pertinent Federal, State and local transportation, environmental, and planning agencies.  FHWA 182678.  The Lead Agencies[6] on the ICC study commenced the NEPA process in 2003 with public hearings attended by some 800 citizens, followed later by public workshops attended by some 1,200 citizens, followed in 2005 by four public hearings in Montgomery and Prince George's Counties attended by 1,881 people, with more than 700 providing testimony or written comments.  FHWA 182751-52.

Over 3,800 comment letters were submitted after the publication of the DEIS, and 785 letters were submitted following the publication of the FEIS, including comments from state and federal agencies and local jurisdictions as well as extensive comments submitted by Plaintiffs in this case.

---

[5] Environmental Stewardship and Transportation Infrastructure Project Review, 67 Fed. Reg. 59, 449 (Sept. 18, 2002), reprinted in 3 C.F.R. section 250 (2003).

[6] The lead agencies are the Federal Highway Administration ("FHWA"), the Maryland Department of Transportation ("MDOT"), Maryland State Highway Administration ("SHA"), and the Mryland Transportation Authority ("MTA"), with the U.S. Environmental Protection Agency ("EPA"), the U.S. Army Corps of Engineers ("Corps"), and the Maryland Department of the Environment ("MDE") as Cooperating Agencies.

FHWA 182752.  The scoping meetings and workshops dealt primarily with the draft "Purpose and Need" statement and the alternatives proposed to be studied.  Through the process, eighteen (18) potential alternatives were identified.  FEIS S-19 (FHWA141903).  The State also operated an interactive Website, which provided the public with ICC Study information throughout the project development phase. FHWA 142948.  The agencies answered *every* substantive comment submitted.  *See* Record of Responses to Public Comments ("RTC").  The three volumes of the FEIS, as well as the two volumes of the Record of Decision ("ROD")[7], demonstrate a thorough, transparent review by the federal, State, and local agencies of the project's issues, impacts and alternatives, and thoughtful consideration and response given to a vast amount of public comment.

This seemingly open and deliberative process culminated in the 2006 Final Environmental Impact Statement ("FEIS") and the Record of Decision ("ROD").  The United States Department of Transportation and the Federal Highway Administration ("FHWA") signed the ROD on May 30, 2006, selecting Corridor 1 as the route for the Intercounty Connector ("ICC") project.

Plaintiffs argue that Defendants' approval of the ICC project is inadequate, constituting violations under NEPA, Section 4(f), the CWA, the CAA, and Section 109(h).  These alleged violations will be addressed accordingly.

## II.  STANDARD OF REVIEW

### A.  Administrative Procedure Act

---

[7] *See*. Federal Highway Administration ("FHWA") ROD and United States Army Corps of Engineers ("USACE") ROD.

8

Claims brought under NEPA, Section 4(f), CWA, CAA, and Section 109(h) are subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §706 *et seq*. Neither of these statutes provides an independent cause of action, and therefore falls under the aegis of the APA. *See e.g. Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 882 (1990). Generally, the role of a reviewing court is limited, and the standard of review of an agency action is one that is highly deferential to the agency. The Court's role is only to assess whether the agency's decision is "within the bounds of reasoned decision-making." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 432 U.S. 87, 105 (1983). Furthermore, the reviewing Court is to base its decision on the administrative record and is not "generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Camp v. Pitts*, 411 U.S. 138,143 (1973).

The scope of review of an agency's informal decision-making, the kind that occurs under NEPA and the above statutes, is under the "arbitrary and capricious" standard of review. This standard requires that courts must uphold agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971).

An agency's action would be arbitrary and capricious if the agency relied on "factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Hughes River Watershed Consv. v. Johnson*, 165 F.3d 283, 287-288 (4th Cir. 1999).

Under this standard of review, the Fourth Circuit has held that a court must decide if the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Virginia Agric. Growers Ass'n., Inc. v. Donovan*, 774 F.2d 89, 93 (4th Cir. 1985) (quoting *Overton Park*, 401 U.S. at 416). While "this inquiry into the facts and the record is to be searching and careful, the ultimate standard of review is a narrow one." *Id.* The court is precluded from substituting "its judgment for that of the agency." *Id.* The agency is obligated to examine the available evidence and to articulate a "rational connection between that evidence and its exercise of discretion. *Id.*; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### B. Summary Judgment

Because claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record, such claims are properly decided on summary judgment. *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F.Supp. 1325, 1332 (D.Md. 1991), *aff'd*, 1992 U.S. App. LEXIS 17466 (4th Cir. July 29, 1992)*; see also* §10B Wright and Miller, *Federal Practice and Procedure 3d* §2733 (2007). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Additionally, the parties involved have submitted their motions for summary judgment and have agreed that the complaints can and should be resolved by this Court as a matter of law on their Cross Motions for Summary Judgment.

## III. DISCUSSION

### A. National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*. (2007),

10

"declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA has in fact become the "basic national charter for protection of the environment." 40 C.F.R. §1500.1 (2007). Compliance with NEPA ensures that federal agencies will consider significant environmental impacts of federal action, make available the relevant information, and open to public scrutiny their decision making process. *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001).

Section 102(2) of NEPA is "one of the 'action-forcing' provisions intended as a directive to 'all agencies to assure consideration of the environmental impact of their actions in decisionmaking.'" *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (quoting Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)). The provision also ensures that "agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1(a). NEPA does not mandate a particular outcome for a proposed project; rather, it is a procedural statute which prescribes the process by which the agency is to reach an informed decision. *Robertson,* 490 U.S. at 350-51 (1989).

In reviewing an agency's efforts to comply with NEPA, the Court must examine whether the agency took a "hard look" at a proposed project's environmental effects before acting. *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002). An agency takes a "hark look" when it "obtains opinions from experts outside the agency, gives careful scientific scrutiny, and responds to all legitimate concerns that are raised." *Hughes River*, 165 F.3d at 288 (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989). Notwithstanding the reviewing obligation, the Court must keep in mind that agency action is not required to be perfect. In fact, "Congress did not intend to mandate perfection" when it created NEPA. *Sierra Club v. Morton*, 510 F.2d 813, 820 (5th Cir 1975).

While the Court's role is to ensure that the procedural requirements of NEPA have been satisfied, the Court will "require only the 'statutory minima,' refusing to substitute [the Court's] judgment for the judgment of the administrative agencies charged with satisfying the requirements of NEPA." *Druid Hills Civic Ass'n v. Fed. Hwy. Admin.*, 772 F.2d 700, 709 (11th Cir. 1985); *see also Kleppe*, 427 U.S. at 410 n.21 (the Court cannot "substitute its judgment for that of the agency as to the environmental consequences of its actions"). If the Court is satisfied that the agency has taken the mandated "hard look" at the environmental effects of a proposed agency action, the Court must then consider whether the agency's conclusions are arbitrary and capricious. *Hughes River*, 165 F.3d at 288. If the agency has followed the proper procedures mandated by the Act, and if there is a rational basis for its decision, the Court will not disturb the agency's judgment. *Id.*

Plaintiffs have raised a myriad of concerns with respect to Defendants compliance, or lack thereof, with the mandates of NEPA. However, in an effort to streamline the major issues presented, the Court will focus on three main arguments advanced by the Plaintiffs: (1) that Defendants' narrowly constructed the "Purpose and Need" statement as to exclude reasonable alternatives; (2) that Defendants failed to consider reasonable alternatives, including alternatives presented by Plaintiffs; and (3) that Defendants failed to consider and study adverse environmental impacts.

### 1. Purpose and Need Statement

Federal agencies[8] are required to prepare detailed environmental impact statements ("EIS") when they contemplate "major Federal actions[9] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c).[10] By requiring a detailed statement of the environmental

---

[8] "Federal agency" means all agencies of the Federal Government, with the exception of "the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office." 40 C.F.R. § 1508.12.

[9] See 40 C.F.R. 1508.18 (defining "major Federal action").

[10] Section 4332(2)(c) provides:

    The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all
    agencies of the Federal Government shall --

consequences of a proposed federal action, the EIS serves three major purposes.  First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  *Robertson,* 490 U.S. at 349.  Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Dep't. of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004).  Third, and most importantly, it insures the integrity of the administrative process.  *Sierra Club*, 510 F.2d at 820.

An EIS must begin with a statement of the "Purpose and Need" for the proposed federal action.  *Alliance for Legal Action v. FAA*, 69 Fed. Appx. 617, 621-622 (4th Cir. 2003).  The Council on Environmental Quality ("CEQ")[1] regulations require that an EIS "briefly specify the underlying purpose and need to which an agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.   The purpose and need statement "necessarily dictates the range of 'reasonable' alternatives."  *Carmel-By-The-Sea v U.S. Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir. 1997).  The statement of a project's purpose and need is left to the agency's expertise and discretion, and Courts defer to the agency if that statement is reasonable.  *Alliance*, 69 Fed. Appx. at 622.

---

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on –
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
[1] CEQ regulations are promulgated to implement NEPA.  These regulations "are binding on all federal agencies, and CEQ's interpretation of NEPA is entitled to substantial deference."  *Sugarloaf Citizens Ass'n v. Fed. Energy Reg. Comm'n*, 959 F.2d 508, 512 n.3 (4th Cir. 1992); s*ee also* 40 C.F.R. § 1500 *et. seq.*

When reviewing an agency decision, the Court need only apply a "rule of reason" standard, which allows for a deferential review of an agency's compliance with the NEPA requirements. *See Alliance*, 69 Fed. Appx. at 622 ("we defer to the agency if the statement is reasonable"); *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (courts evaluate whether an agency's objectives are reasonable "with considerable deference to the agency's expertise and policy-making role."); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("As the phrase 'rule of reason' suggests, we review an agency's compliance with NEPA's requirements deferentially" and "uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable"). The Court must determine whether the agency's definition of the goals and objectives are reasonable, whether the agency has discussed in detail the alternatives, and whether the discussion of the alternatives is reasonable – in light of the particular goals and objectives. *See id.*

The Court, however, does recognize that agencies may attempt to define the objectives of its actions in unreasonably narrow terms. "One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997). On the other hand, an agency may not "frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities." *Citizens Against Burlington*, 938 F.2d at 196. Instead, agencies must take a hard look at "the factors relevant to the definition of the purpose," and must follow the mandates of NEPA when considering reasonable alternatives. *Id.*

Here, Plaintiffs argue that the statement of "Purpose and Need" in the EIS is drawn so narrowly as to exclude from consideration reasonable alternatives to the proposed ICC. The Court reviews

14

the agencies' decision with deference, keeping in mind that the Court must not disturb the agency's decision so long as it was reasonable.

### a. Purpose

The defined purpose of a project certainly affects the possibility of alternatives for that particular project. If the purpose is defined "so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, [the] EIS would become a foreordained formality." *Citizens Against Burlington*, 938 F.2d at 196. The stated goals for the proposed ICC project is to "link existing and proposed development areas between the I-270 and I-95/US-1 corridors within central and eastern Montgomery County and northwestern Prince George's County with a state-of-the-art, multimodal, east-west highway that limits access and accommodates passenger and goods movement." ROD at 33; FEIS at I-1.

Plaintiffs argue that Defendants have framed their statement of purpose as a pre-selected solution and have stated the purpose of the proposed project in such a way as to exclude consideration of reasonable alternatives. To support their argument, Plaintiffs note that several federal and state agencies found fault with the narrow statement of the purpose.[12] Specifically, Plaintiffs bring to the attention of the Court an observation made by the U.S. Environmental Protection Agency's ("USEPA"),[13] noting that "[t]he term 'east-west highway' should be modified to reflect that the study includes multi-modal transportation options . . . '[h]ighway' could be replaced by the phrase 'transportation system' or 'transportation improvements.'" Thus, Plaintiffs

---

[12] Plaintiffs mention comments made Maryland's Department of the Environment, U.S. Environmental Protection Agency's ("USEPA"), and the National Park Service ("NPS").

[13] Thomas C. Voltaggio, Deputy Regional Administrator of the USEPA, made these comments in a letter to Neil Pederson of the Maryland State Highway Administration. *See* AR 038604.

15

question Defendants' purpose statement, as they claim it screens out all alternatives other than building a new highway.

Defendants respond by asserting that the mere mention of the word "highway" does not obviate the need to consider non-highway alternatives, and has presented sufficient case law demonstrating that courts have consistently upheld purpose and need statements that called for the specific purpose of constructing a road, so long as the agency also considered broader transportation objectives.[1]   For example, the D.C. Circuit upheld the purpose and need of the Woodrow Wilson Bridge that specifically provided for widening the Beltway to twelve lanes.  *See City of Alexandria*, 198 F.3d at 867-68.  *See also Davis v. Latschar*, 83 F. Supp. 2d 1, 8 (D.D.C. 1998) (The court held that "[e]ven if the Park Service's alteration of the objective's wording were suspicious, any suspicions are allayed by its thorough consideration of all alternatives. … the Park Service initially considered and rejected a wide range of non-lethal alternatives.").  Similar to the Court in *Davis*, this Court finds that Defendants' broad and thorough consideration of non-highway alternatives disproves Plaintiffs' contention that Defendants' purpose statement screened out non-highway alternatives.  It is also worth noting that the agencies Plaintiffs referred to, who initially gave negative comments on Defendants' purpose and need statement, concurred that their comments had been addressed in the version that ultimately appeared in the EIS.  *See* Concurrence Letters from the Corps and MDE (FHWA 143582, 143507); *see also* Letter from EPA (Sept. 19, 2003) (FHWA 143593-94) (accepting wording of revised P&N Statement); FHWA 18282.

---

[1] *See N.C. Alliance for Transp. Reform v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 686-87 (D. N.C. 2001) (proposing construction of beltway for the purpose of "circumferential connection of existing roads" did not define purpose of project too narrowly because it was just one of several more general goals); *City of South Pasadena v. Slater*, 56 F.Supp.2d 1106, 1119 (C.D. Cal. 1999) (proposing extension of freeway for the purpose of "completing the freeway network" did not define purpose of project too narrowly because non-freeway criteria included in P&N); *Sierra Club v. U.S. Dep't of Transp.*, 962 F. Supp. 1037, 1042-43 (D. Ill. 1997) (proposing construction of a tollroad for the purpose of providing a north-south corridor did not define purpose of project too narrowly because more general objectives such as improving local travel were considered as well).

The record indicates that Defendants considered broader transportation objectives, such as improving mobility or safety, which could allow for a broad range of reasonable alternatives. *See* FEIS Vol. 3, App. R-6 at 1. The mere mention of the word "highway" in the purpose statement did not prevent Defendants from considering broader transportation objectives, nor did it automatically exclude them from considering non-highway alternatives. Therefore, based on the Court's review of the administrative record, the Court does not find that the stated purpose of building a "multi-modal highway" is too narrow. Moreover, the Court finds that Defendants did not act arbitrarily and capriciously in constructing the purpose statement.

### b. Need

In addition to drawing a narrow purpose statement, Plaintiffs claim that Defendants narrowly defined the needs of the ICC project to eliminate consideration of alternatives besides the preferred ICC highway.[15] Plaintiffs also maintain that Defendants failed to establish that these needs are in fact legitimate needs either in the ICC study area or in the region. In addition, Plaintiffs question the lack of data used by Defendants to demonstrate the need for the project.

Noting that the concept of the ICC came into existence over five decades ago, Defendants explained, in detail, the needs of such a long-awaited project. These needs included, among other things, increasing the severely limited mobility and safety in the developed portions of Montgomery and northwestern Prince George's Counties, supporting the continued attraction and retention of businesses and employment opportunities in the region, and supporting the region's orderly growth

---

[15] Defendants' five identified needs are: (1) To increase community mobility and safety; (2) to facilitate the movement of goods and people to and from economic centers; (3) to provide a cost-effective transportation infrastructure to serve existing and future development patterns reflecting local land use planning objectives; (4) to help restore natural, human, and cultural environments from past development impacts; and (5) to advanced homeland security.

and development patterns by constructing a highway that has long been a part of local land use planning objectives for both counties.[1]  FEIS at I-2.

The Court agrees with Defendants that the five needs articulated in the purpose and need statement are the product of a thoughtful, deliberative interagency and public participation process that balanced transportation needs with environmental concerns.  The record indicates that a broad interagency collaborative process took place, showing that over 100 representatives from local, State, and federal agencies, resulted in several refinements to the purpose and need statement. ROD at 5; FEIS Appendix R-6 at 1.  The Court also finds that the record demonstrates that Defendants relied upon sufficient data to determine the needs of the proposed action.  *See* FHWA 144212-13, 182677, 182726-41 (explaining the need for mobility and safety);  FHWA 072677-709 (evidence supporting the economic needs of the proposed action); FHWA 182727-37, 144525 (discussing the need to support local land use plans).

The record strongly suggests that Defendants' statement of the project's needs complies with NEPA.  NEPA does not "substantively constrain an agency's choice of objectives," nor does it mandate specific objectives and needs that an agency must follow. *City of Alexandria*, 198 F.3d at 867.  NEPA leaves these decisions to the discretion of the agencies involved.  In light of this fact, the Court must defer to the expertise of the agency in evaluating the needs and objectives of the proposed action.  It is not the Court's role to second-guess the expertise of the agencies when

---

[1] Plaintiffs also argue that Defendants failed to disclose the inconsistencies of the proposed ICC with local land use plans and objectives, as required by NEPA.  For example, Plaintiffs argue that Defendants did not mention that Prince George's County Subregion 1 Master Plan was amended in 2005, in part, to remove its support for the proposed ICC (AR 104560).  The record indicates that Defendants consulted with all agencies with jurisdiction for planning in the study area and reviewed the more than 50 local and regional plans to determine how the objectives outlined in the purpose and need statement relate to local transportation plans.  (FEIS Vol. I at II-26 to 31 (describing plans)).  Defendants acknowledged that the proposed ICC does not satisfy every goal identified in the referenced local plans; however, the ICC does identify some of the plans' goals and is consistent with these goals.  This issue will also be fully discussed in the section addressing the amicus brief filed by the Elected Officials of Prince George's County.

determining the needs of the proposed project.  After carefully reviewing the record presented, the Court does not find that Defendants acted arbitrarily and capriciously in selecting the needs for the proposed project.

Moreover, the Court must also note that purpose and need statements have been consistently upheld where agencies have explored reasonable alternatives that met the agencies' stated objections. In fact, there has been only one occasion where a Court has struck down an agency's purpose and need statement.[17]  *See Simmons*, 120 F.3d at 666-70.  *Simmons* is distinguishable from the case before the Court because the agency in *Simmons* failed to explicitly state and examine the purpose and need behind a dam project and had not adequately considered alternatives.  *Id.* at 670. In *Simmons*, the City of Marion, Illinois proposed building a new dam and reservoir for the purpose of supplying water to the city and a Water District.  *Id.* at 666.  Since the project's inception, the defendants defined the purpose as supplying the water from a single source and thus, focused on only one idea; therefore, the Court found that the agency never looked at reasonable alternatives that did not include the single source.  *Id.* at 667-68.

Here, the record clearly indicates that Defendants not only explicitly stated and closely examined the purpose and need behind the ICC project, but they also identified and carefully studied various alternatives.  More specifically, the project began with over 300 alternatives, which were later narrowed down to eighteen (18), approximately nine of which were not highway alternatives ( *see infra at 2,* the Court discusses the details of these alternatives below).  Therefore, the Court finds no violation of NEPA with regards to the stated purpose and need, nor does the Court find that Defendants acted arbitrarily and capriciously when constructing the "Purpose and Need" statement.

---

[17]A district court has also found NEPA violations when agencies have failed to enunciate any statement of purpose and need at all. *See Sierra Club v. Flowers*, 423 F.Supp.2d 1273 (S.D. Fla. 2006).  However, this is not applicable here because the agencies explicitly stated the purpose and need behind the ICC project.

2. *Reasonable Alternatives Analysis*

An environmental impact statement must discuss reasonable alternatives "to the proposed action."  42 U.S.C. § 4332(2)(C)(iii).  The alternatives analysis is indeed the "heart of the environmental impact statement." 40 C.F.R. §1502.14.  NEPA does not require that agencies take one type of action over another when determining what alternatives are reasonable.  *See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368 (D.C. Cir. 1999).  NEPA simply demands that the agencies "rigorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14.[18] The Court recognizes that the consideration of alternatives is extremely important in the NEPA process, particularly considering that "is the heart of the environmental impact statement." *Id.*  Plaintiffs argue that Defendants failed to consider and evaluate reasonable alternatives to the proposed project and that Defendants arbitrarily dismissed alternatives that could meet the study area's needs.

In determining whether Defendants adequately considered reasonable alternatives, the Court notes that "[t]he agency bears the responsibility for deciding which alternatives to consider in an environmental statement" and "for defining at the outset the objectives of an action." *Citizens Against Burlington*, 938 F.2d at 195-96.  The agency "need not consider all of the possible alternative actions in the EIS; it is only required to look at those that are reasonable in light of the

---

[18] Section 1502.14 provides, in detail, that agencies shall:
(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
(c) Include reasonable alternatives not within the jurisdiction of the lead agency.
(d) Include the alternative of no action.
(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

project's stated purpose." *Alliance*, 69 Fed. Appx. at 622; *see also Citizens Against Burlington*, 938 F.2d at 195 ("CEQ regulations oblige agencies to discuss only alternatives that are feasible, or (much the same) reasonable."). However, the "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Res. Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1994).

As it has been generally noted, "the term 'alternatives' is not self-defining," *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Coun. Inc.*, 435 U.S. 519, 551 (1978). The Court also recognizes that NEPA and CEQ "does little to clarify the baseline against which a reasonable alternative is to be measured." *City of Alexandria,* 198 F.3d at 867. This lack of guidance for agencies with respect to the "reasonable alternatives" has led courts to "delimit the universe of the action's reasonable alternatives" and to evaluate the agency's choices of reasonable alternatives "in light of the objectives [and goals] of the federal action." *Id.* Again, the Court's review is not of the agency's substantive judgment, but of the sufficiency of the agency's consideration of the reasonable alternatives. *See Robertson*, 490 U.S. at 350.

In considering alternatives, the agencies were required to address three particular questions. "First, what is the purpose of the proposed project, i.e. major federal action? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular reasonable alternative?" *See Highway J Citizens Group v. Mineta*, 349 F.3d 938, 961 (7th Cir. 2003). Having discussed the purpose in the preceding section, the Court will focus solely on the second and third steps in the Court's analysis of the alternatives considered by Defendants.

Given the stated purposes of the ICC, the Court finds that Defendants considered a sufficient number of reasonable alternatives and explored them to the extent necessary for the ICC project.

21

The record demonstrates that Defendants initially considered a broad range of alternatives and measured their relative effectiveness to meet the project's mobility, safety and other objectives. Defendants conducted a preliminary screening of over 300 suggestions (generated by agencies and citizens) for project alternatives, which were supplemented with alternatives and options considered in past studies. ROD 34-35; FHWA 142134. Each alternative was analyzed to determine whether it met the purpose and need and whether it presented adverse environmental impacts. From this first level of screening, eighteen alternatives[19] were selected for preliminary examination to determine if they warranted in-depth study in the EIS. *Id.*

Contrary to Plaintiffs' argument that Defendants failed to consider non-highway alternatives, eight of the eighteen alternatives were non-highway alternatives. *See* FHWA 142134. The FEIS adequately discussed each of the eighteen alternatives to determine whether they would meet the project's purpose and need. *See* FHWA 142134-142160. The record demonstrates that between September 2003 and March 2004, the Lead Agencies held eight meetings with federal, state, and local agencies to discuss draft reports of the eighteen alternatives retained for detailed study ("ARDS") to determine if these alternatives could adequately address the purpose and need of the ICC project. FEIS Vol. 3, App. R-6 at 2. In addition, in November 2003, the study team held three public workshops on alternatives. FHWA ROD at 35. The ARDS determination was revised in response to comments. *See*, *e.g.* FHWA 056177-056199 (responses to agency comments on January

---

[19] The 18 alternatives considered were: The Midcounty Highway-MM 198 Alternative; Upgrade Existing Roads Alternative; Transit-Only Alternative; Howard County Connection Alternatives; Balanced Land Use Alternative; Combined Balanced Land Use and Transit Alternative; M-NCPPC and Board Hybrid Alternatives; Improve I-495; Auto-Train Route; Extend ICC West of 270 and/or East of U.S.-1; Construct a roadway from I-270/Falls Road to the Master Plan Alternative at MD 97 in lieu of building the Master Plan Alignment between I-370 and MD 97; Move the ICC south of all other alternatives; Build I-95 to Continue through District of Columbia; Transportation Systems Management/Travel Demand Management (TSM/TDM) Alternative; Construct Two Separate East and West Highway Links; Corridor 1 (similar to the Master Plan Alternative, as identified in previous studies); Corridor 2 (similar to the Northern Alternative, as identified in previous studies); and No-Action. *See* AR 042357-68, 182709.

7, 2004 draft ARDS report); *see also* FEIS Vol. 3, App. R-8 at 20-30; RTC III-25 - 41(documenting consideration of comments from the public about the ARDS determination).

After evaluating the eighteen alternatives, the ICC study team determined that fifteen of the alternatives would be dropped from further consideration because they did not adequately meet the purpose and need of the project.  Agencies may properly eliminate from further study those alternatives that do not meet its reasonable objectives. *City of Alexandria*, 198 F.3d at 867. Defendants' reasons for eliminating each alternative were explained in the FEIS Vol.1, III-9 to III-26, and documented in the March 3, 2004 technical report "Alternatives Retained for Detailed Study," FHWA 056051-056139.  Additional support for the ARDS determination is found in the administrative record. *See* FHWA 18062-181421.  Finally, Defendants evaluated three alternatives in detail:  a no-action alternative and two build alternatives (Corridor 1 and Corridor 2).[20]  ROD 37; FEIS Vol. 1 at III-28 - 35 (summarizing the alternatives).  The no-action alternative assumed that all transportation improvements formally planned for construction by 2030, except for the ICC, will be built.  FHWA ROD at 37; *see also* FHWA 078615-078620 (listing major highway and transit projects planned for region).  ROD at 37-38.  The agencies ultimately decided to select Corridor I.

The record clearly indicates that Defendants adequately considered reasonable alternatives and engaged in a very thorough and collaborative process when deciding which alternatives would be eliminated.  The Court recognizes that Defendants were presented with a range of alternatives, including those presented by Plaintiffs.  Undoubtedly, the range of alternatives for an agency to

---

[20] Plaintiffs also argue that Defendants only studied the "no-action" alternative and two very similar corridor alignments for the ICC.  Plaintiffs state that each build alternative is a six-lane highway connecting I-270, US-1, and I-95 at the exact same points.  Corridor 2 and Corridor 1 (the Selected Alternative) overlap for roughly half of the latter's length – between I-270 and MD-97 – and again from west of I-95 to US-1.  In other words, the only other action alternative is merely a variation of the selected route.  The Court agrees with Defendants that the corridors' distinct paths can be easily seen by reference to a map.  ROD at 40.  The Court also recognizes that the corridors would result in different environmental impacts and costs.  The Court finds that Defendants' explanation for eliminating Corridor 2 was also reasonable.

23

consider when constructing a project to fit the stated purpose and need in Defendants' FEIS can potentially be as thick as the leaves on a very windy autumn day.  However, as the Supreme Court has noted, a "detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."  *Vermont Yankee*, 435 U.S. at 551-52; *see also Carmel-By-The-Sea*, 123 F.3d at 1155 (The EIS "need not consider an infinite range of alternatives, only reasonable and feasible ones.").  The Court, therefore, finds that Defendants complied with NEPA in its consideration of reasonable alternatives.  In addition, the Court finds that Defendants satisfied the CEQ's requirement that the agency "briefly discuss" its reasons for eliminating alternatives from detailed study.

*Plaintiffs' Suggested Alternatives*

Plaintiffs also argue that their proposed alternatives were reasonable and thus, warranted inclusion in the EIS study.  Plaintiffs furnished Defendants with a detailed, 91-page report from Smart Mobility, Inc. ('SMI Report') proposing a number of non-highway alternatives to the ICC, including: (1) transit oriented land use and investment;[21] (2) adding toll lanes and express bus service;[22] (3) High Occupancy Toll lanes ("HOT");[23] and (4) hybrid: transit oriented HOT lane.[24] Plaintiffs claim that these alternatives could meet the transportation needs of the study area identified in the EIS.  If measured against other alternatives, the ICC costs more money, causes more

[21] This alternative is comprised of the following projects and policies: future employment and housing development is re-directed so that people live close to their workplaces and close to transit; construct seven miles of the "purple line" rail transit project; construct a new four mile metrorail extension to the north of Shady Grove station; construct a new metro station at Montgomery College; establish express bus service on I-270, I-95, and four major roads; construct a north-south busway on Georgia Avenue; implement the "metro matters" transit improvement package; make capacity enhancements, widen, or reconfigure of many specified roads/interchanges. FEIS Vol. 3, App. R-9 at 11.
[22] This alternative consists of hundreds of mostly new, tolled, lane-miles on I-270, the Capital beltway, and I-95; plus 357 miles of new express bus routes. FEIS Vol. 3, App. R-9 at 13-14.
[23] This alternative would convert hundreds of lane-miles of I-270, the Capital beltway, and I-95 to tolled lanes, which would be free for HOV-3 and express busses. FEIS Vol. 3, App. R-9 at 15.
[24] This alternative would generally include the transit initiatives described in the first alternative and also would convert hundreds of lane-miles of I-270, the Capital beltway, and I-95 to tolled lanes, which would be free for HOV-3 and express busses. FEIS Vol. 3, App. R-9 at 16.

suburban sprawl in rural neighborhoods, and fails to solve any long-standing transportation problems.

Despite Plaintiffs' contention that their goal was not to demonstrate that their alternatives actually performed better than the alternatives contained in the FEIS, what leaps out at the Court is that Plaintiffs are attempting  to substitute their alternatives with those selected by the agencies, repeatedly noting how their proposed alternatives provide "superior" performance than the proposed ICC.  It is not the Court's role to get involved in what some may label as a "tug of war game" between Plaintiffs and Defendants to determine which alternatives are actually better; however, the Court must determine whether Defendants considered reasonable alternatives in compliance with NEPA.

The record indicates that Defendants specifically considered the alternatives advanced by Plaintiffs.  *See* FEIS Vol. 3, App. R-9, ROD at 47-52.  Defendants had already considered alternatives that were similar to two of the four alternatives proposed in Plaintiffs' SMI Report – the transit oriented and express bus service alternatives.[25]  NEPA does not require a "separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered or which have substantially similar consequences."  *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 868 (9th Cir. 2004); *see also City of Carmel*, 123 F.3d at 1142 (finding agency need not consider plaintiff's suggested alternative that was similar to alternative discussed in detail in FEIS and did not amount to a new, substantive proposal).

After evaluating each of Plaintiffs' alternatives, Defendants determined that these alternatives would not meet the purpose and need of the project.  For example, Defendants noted that Plaintiffs' proposed alternatives addressed broader regional transportation needs rather than the east-

---

[25] The ICC will include express bus service.  *See* FEIS at 144524 ("six express bus routes have been identified for detailed study").  The study team is also conducting a transit study.  *Id.*

west mobility needs of the study area and they failed to provide sufficient mobility within the study area.[26]

Plaintiffs further posit that Defendants were still required to conduct a detailed analysis of Plaintiffs' alternatives even if their alternatives only partially satisfies the purposes and needs of a project with less environmental impact.  *See N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533 (11th Cir. 1990).  Plaintiffs' reliance on this case is not entirely misplaced; however, Plaintiffs infused a much stronger holding into the case.  The Eleventh Circuit merely acknowledged that "an alternative partially satisfying the purpose and need of the proposed project may or may not need to be considered depending on whether it can be considered a 'reasonable alternative.'" *Id.* at 1542.  This case is not inconsistent with the general proposition that the alternatives must be reasonable in light of the project's purpose and needs.

Defendants argue, and the Court agrees, that the agency was not required to study Plaintiffs' alternatives in the same depth as the three alternatives retained for detailed study because it was determined that Plaintiffs' alternatives were not reasonable.  As noted above, NEPA requires only that the agency *briefly discuss* the reasons why an alternative is eliminated from detailed study.  40 C.F.R. § 1502.14(a) (emphasis added).  The agency was also not required to retain Plaintiffs' suggested alternatives for full analysis where it was previously determined that such alternatives would not meet the needs of the ICC project.  *See Ass'ns Working for Aurora's Residential Env't. v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998) (upholding Defendants decision to eliminate a mass transit alternative from full analysis in the EIS because such an alternative to highway construction would not meet the congestion relief goals of the project, stating "it is clear

---

[26] Alternatives addressing different purposes and goals are inherently unreasonable or infeasible.  *See City of Alexandria*, 198 F.3d at 868; *Route 9 Opposition Legal Fund v. Mineta*, 75 Fed. Appx. 152, 153-54 (4th Cir. 2003).

than an agency need not independently evaluate alternatives it determines in good faith to be ineffective as a means to achieving the desired ends"); *see also N. Buckhead*, 903 F.2d at 1541-43 (upholding FHWA's decision to eliminate a rail transit alternative from detailed consideration because although it would provide additional capacity, it would not provide congestion relief.)

The Court now turns to Plaintiffs argument that Defendants arbitrarily and capriciously rejected common measures of effectiveness ("MOEs") necessary to evaluate Plaintiffs' alternatives against the area's needs.  MOEs are often used to determine performance and effectiveness of an alternative.  Plaintiffs argue that the Defendants failed to use vehicle miles traveled ("VMT"), vehicle hours traveled ("VHT"), or vehicle hours of delay ("VHD") as performance measures for the alternatives analysis.  Defendants maintain that these MOEs were not used in the ICC analysis because they "reflect the objective of reducing regional auto travel and increasing regional transit use, which are not objectives of the ICC purpose and need." FEIS Vol. 3, App. R-9 at 5.

The record indicates that Plaintiffs' MOEs do not fully address the major needs of the study area – roadway congestion or east-west mobility.  The record indicates that Defendants studied the differences in the models and concluded that the FEIS presents conservative projections for future traffic levels on the ICC, that the model used by SMI would not significantly change the FEIS conclusions, and that it was appropriate to rely on the travel forecasting results preserved in the FEIS rather than duplicate the FEIS travel forecasting using the more recent projections of SMI.  *See* FHWA 182581 at 182582-85.  In addition, the use of the MOEs requires a high level of technical expertise, and the Court must defer to the informed discretion of the responsible federal agencies in such a situation. *Marsh*, 490 U.S. at 377 (1989); *see also N. Buckhead*, 903 F.2d at 1544 (finding agency modeling entitled to deference and the court should not be a "super professional transportation analyst" in order to determine the appropriate model to use).

27

Plaintiffs raise other arguments with respect to their position that Defendants failed to reasonably consider their alternatives.[1]  However, in light of the Courts review of the record and the analysis Defendants conducted of Plaintiffs' alternatives, the Court does not believe that those arguments warrant a detailed discussion in this opinion.  The record reasonably supports Defendants' dismissal of Plaintiffs alternatives. Because the Defendants' findings are supported by the record, the Court must defer to it.  The Court does not find that Defendants acted arbitrarily and capriciously in dismissing Plaintiffs' alternatives.

The Court concludes that Defendants acted reasonably in defining the purpose and needs of its action, in eliminating alternatives that would not achieve it, and in discussing the proposal that would achieve the purpose and needs of the project.  Although the Court recognizes that the EIS may not be a portrait of perfection, the Court does find that it was reasonably complete and satisfied the statutory minimum requirement under NEPA.  The agency's action is not inconsistent with or does not compromise the intent, spirit, and integrity of NEPA.  Therefore, the Court finds that the agency complied with the requirements of NEPA.

*3.  Consideration of Environmental Impacts*

An environmental impact statement must include a discussion of the environmental impacts of the proposed action. 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. § 1502.16.   The CEQ regulations provide that an environmental impact statement "shall contain a full and fair discussion of significant environmental impacts" and that "impacts shall be discussed in proportion to their

---

[1] Plaintiffs argue that Defendants failed to consider a combination of alternatives and instead treated each alternative exclusively.  The record indicates that Defendants considered a variety of alternatives with various combinations of highway, transit, and road improvements.  *See, e.g.*, FEIS Vol. 1 at III-1 to 26; FEIS Vol. 3, App. at R-9.  In addition, the ICC project includes a transit component, a bicycle/pedestrian plan, and environmental stewardship activities.  ROD at 8.  Plaintiffs also argue that Defendant relied on stale and inaccurate data to dismiss Plaintiffs' alternatives; yet, Defendants relied on current data to justify the alternatives actually considered in the EIS.  The Court does not believe that this argument warrants discussion, as the Court has already determined that Defendants dismissed Plaintiffs' alternatives because Defendants' reasonably determined that those alternatives did not satisfy the purpose and need of the project.

significance." 40 C.F.R.§§ 1502.1, 1502.2(b).  NEPA also requires Defendants to identify whether all practicable means to avoid or minimize environmental harm from the selected alternative have been adopted, and if not, why not.  40 C.F.R. §§ 1505.2(c).

Plaintiffs argue that Defendants failed to study important adverse impacts and mitigation measures and disclose the adverse climate change impacts resulting from the proposed Selected Alternative.  Plaintiffs also argue that the FEIS inadequately and inaccurately describes reasonably foreseeable impacts of building the ICC, specifically, those related to water quality, air quality, traffic impacts, and impacts of mobile source toxins.

*a. Water Quality*

Plaintiffs claim that Defendants relied on a faulty comparison of water quality impacts between the two build alternatives when Defendants made the determination that the build alternative not selected – Corridor 2 – is a less environmentally attractive option than the ICC. Specifically**,** Plaintiffs contend that the lead agencies failed to compare Corridors 1 and 2 on the basis of the secondary and cumulative impacts to water quality from induced development.  They allege that certain modeling analyses undertaken to compare the two alternatives utilized inconsistent inputs, thus compromising the final decision.

According to Defendants, the lead agencies, through the use of the Expert Land Use Panel ("ELUP"), quantitatively assessed the potential acreage of secondary development associated with both the Corridor 1 and Corridor 2 alternatives.  *See* FEIS Vol. 1 at IV-398-409.  Based on the ELUP process and their determination of the effects of potential secondary development, Defendants concluded that secondary impact was expected to be greater for Corridor 2.  *See* FEIS Vol. 1 at IV-41l, IV-434.

With respect to Plaintiffs' argument that Defendants provided an in-depth quantitative and

qualitative analysis of the Corridor 2 impacts on the Rocky George, but failed to do the same for Corridor 1, the record indicates that only Corridor 2 would have adverse impacts on the reservoirs. *See* FIES Vol. 1., Table IV-60 at IV-184.  In fact, Corridor 1 would not cross the Rocky Gorge reservoir or its tributaries, and Corridor 2 would have.  *Id.*; *see also* FEIS Vol. 1 at IV-187. Moreover, Defendants decided to quantitatively assess the water quality impact on the Rocky Gorge Reservoir in relation to Corridor 2 in response to concerns of the local agency with jurisdiction over the Rocky Gorge Reservoir.  FEIS Vol 3., App. R-5 at 18-23; ROD at 72.

Based on the review of the record, the Court believes that Defendants sufficiently explained their reasons for comparing both Corridors.  The Court also finds that Defendants thoroughly examined the impacts from induced development from each alternative on water quality and did not arbitrarily and capriciously compare the two.  The record fully supports Defendants' reasoning.

### b.  Air and Traffic Impacts

Plaintiffs contend that Defendants violated NEPA by utilizing a growth forecast that assumed building the ICC would have no impact on land use in the region and that the air and traffic modeling used in the FEIS exclude the secondary or indirect impacts entirely.  Plaintiffs note that Defendants used the Round 6.3 forecast (which was based upon expectations of regional growth without the ICC)  to model all of the traffic and air impacts of the no-build alternative and the build alternatives, and thus included no component for induced or secondary development resulting from building the ICC along either Corridor 1 or 2.  Even though the forecast was replaced with a more

accurate updated version by the Metropolitan Washington Council of Governments ("MWCOG"),
before the release of the Draft EIS, Plaintiffs stated that the outdated forecast remained as the chosen
modeling tool used throughout this NEPA process.  Plaintiffs argue that this approach violates
NEPA regulations, which require an EIS to assess all reasonably foreseeable impacts, including
indirect, secondary, and cumulative impacts.  Essentially, Plaintiffs argue that the FEIS should have
included Round 6.4, which incorporated secondary and induced growth impacts and became
available roughly two months before the DEIS was released.

The MWCOG produces official land use forecasts for the region each year.  FHWA 043858.
These land use forecasts are used in analyzing that year's regional transportation planning
documents and air quality conformity determination.  The record demonstrates that the ICC Study
Team used Round 6.2, the land use forecast in effect at that time, in the ICC traffic model.  *See*
FHWA  037791, 041855.  Following Plaintiffs' request that the ICC team start the process of
developing the ICC's traffic model over using the expected Round 6.3 forecast and following
MWCOG's actual release of the Round 6.3 forecast, Defendants did indeed restart the process to
reflect the Round 6.3 land use forecast.  Round 6.3 does not assume the ICC wil be built within its
forecast period, which went to year 2030.

Defendants note that MWCOG approved its updated land use forecast, Round 6.4A, in
November of 2004, just one week before Defendants' DEIS was released.  Defendants also note, and
the record supports, that the agency did not ignore the updated Round 6.4A forecasts.  *See* FEIS Vol.
1 at IV-387.  Round 6.4A was officially adopted only a week before the DEIS was released.  Instead
of re-calculating the traffic model and the secondary and cumulative effects study, Defendants
conducted a limited "sensitivity analysis."  *See* FEIS, Vol. 1 at IV-386-89.  The sensitivity analysis
showed that the 2030 traffic forecast on the western half of the ICC would be essentially the same

(less than 3% difference) using the updated land use forecast and would range from 13% to 20% greater on one section of the eastern half.  *Id*.  The final EIS noted that the section of the ICC showing the 13% - 20% greater traffic using the updated forecast is also the section that was projected to carry the lowest volume so that the increased traffic on the ICC in 2030 using this forecast would not result in a congested ICC and was not considered significant.  *Id*.; RTC at III-172.

The Court recognizes that Federal agencies are not obligated to restart the NEPA process every time new information becomes available.  *See Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 442 (5th Cir. 1981) ("an administrative process can never come to an end if the process must begin again every time new information is available") (citing *Vermont Yankee*, 435 U.S. at 555).  Given the fact that the Round 6.4A land use forecast became effective only a week before Defendants released its DEIS and given the sensitive analysis conducted, the Court believes that Defendants' refusal to re-calculate the traffic model did not preclude informed decision-making and informed public participation in this instance.  Therefore, the Court finds that Defendants complied with NEPA and did not act arbitrarily and capriciously by not relying on the Round 6.4A forecast.

### c.  Impacts of Mobile Source Air Toxics Emitted by the ICC

Plaintiffs next argue that Defendants failed to disclose the significantly increased health risks associated with mobile source air toxics ("MSATs").  They also argue that Defendants impermissibly limited their analysis of MSAT emissions to an estimate of aggregate emissions across the entire study area and provided no comparison of the health risks for residents of new highway alignments compared to non-highway alternatives.

The term "mobile source air toxics" refers to hazardous air pollutants that are emitted from cars, trucks, buses, and various non-road equipment powered by engines that use petroleum products.  66 Fed. Reg. 17,229, 17,234 (March 29, 2001); 40 C.F.R. Parts 59, 80, 85-86.  EPA has determined that MSATs "may have adverse effects on human health and welfare."  *Id.*; *see also* 42 U.S.C. § 7412.  Defendants' area investigation shows that the proposed ICC will result in 4-6% more MSAT emissions than the No-Build alternative.  ROD at 135.  Plaintiffs claim that Defendants point to project emissions solely to minimize their importance for the region as a whole, but ignore the dramatic increase in exposure for residents and children attending schools within the high pollution zone along the right-of-way.  Plaintiffs also argue that the inability to predict exposure with precision does not authorize Defendants to ignore NEPA's mandate to disclose the effects of project emissions on public health, and to compare alternatives based on their health impacts.

To address the highly technical issue of MSAT emissions, Defendants claimed that they adopted a careful approach that reflected the judgment and expertise of the agency's experts in this evolving field.  In Section IV.H.7 of the FEIS, Defendants described the potential effects of MSATs on human health; discussed the national trends in MSAT emissions; summarized the latest scientific research; and assessed the capabilities of current modeling tools.  In addition, the agency presented a quantitative analysis to predict future MSAT emissions in the ICC study area, even though FHWA guidance required no such analysis for this project.  FEIS Vol. 1 at IV-317 to 329.  The analysis showed that total MSAT emissions in the ICC study area will decline dramatically – by as much as 92% – between 2000 and 2030.  FEIS Vol. 1 at IV-327. It also showed that MSAT emission reductions will be only slightly less with the ICC than without it. *Id.*  In other words, Defendants concluded that the ICC will make a "negligible" difference in MSAT emissions in the study area. FHWA, Vol. 1 at III-130.

Defendants also note that EPA has not established a maximum allowable concentration of MSATs in the air, nor has EPA established (or required States to establish) a cap on total MSAT emissions in a region.   As a result, there is no regulatory standard for determining an acceptable level of MSAT emissions or an acceptable concentration of MSATs in the air.  They argue that because EPA has set no such standard for MSATs, there is no regulatory "measuring stick" for evaluating MSAT emissions from a highway project.  Defendants concluded that there were large uncertainties in conducting the health effects analysis to predict the impact of MSAT emissions on the health of the people living near the roadway.  FEIS, Vol. 1 at  III-130-131, 133 - 136, 142. Although noting this uncertainty, Defendants did conduct a MSAT analysis, as explained above, as an aggregate emission across the entire ICC study area.

The Court believes that Defendants' methodology was reasonable and should be upheld. *See Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 129 (D.C. Cir. 1985) (agency has "responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances").  Defendants' failure to consider Plaintiffs' approach to the health effects analysis, which could be ascertained, if at all, only through uncertain modeling techniques, did not preclude informed decision-making under NEPA.  Therefore, based on the record and the facts presented, the Court does not find that Defendants acted arbitrarily and capriciously in failing to consider Plaintiffs' approach to the health effects analysis.

### B.   Section 4(f) of the Department of Transportation Act

The Audubon Plaintiffs bring a claim under § 4(f) of the Department of Transportation Act against the Defendants' approval of the Selected Alternative.  Section 4(f), codified at 49 U.S.C. §303, prohibits the Secretary of Transportation from approving a highway project that requires the

use of a public park, recreation area, wildlife and waterfowl refuge, or land of an historic site of

national, state, or local significance unless:

> (1) there is no prudent and feasible alternative to using the land; and

> (2) the program or project includes all possible planning to minimize
> harm to the park, recreation area, wildlife and waterfowl refuge, or
> historic site resulting from the use.

49 U.S.C. §303(c); *accord* 23 U.S.C. §138(a).

The FHWA must determine whether there is no feasible and prudent alternative before using

a protected resource. *Overton Park*, 401 U.S. at 416; *Hickory Neighborhood Defense League v.*

*Skinner (Hickory I)*, 893 F.2d 58, 60 (4th Cir. 1990). Determining whether an alternative is prudent

and feasible depends on a variety of environmental and community factors. While it is preferable

to choose an alternative that will completely avoid a 4(f) resource, the Court recognizes that

complete avoidance is not always possible or prudent. The next best approach is to choose the

alternative that will cause the least harm to the 4(f) resource, taking into account the qualitative

value of the resource and the mitigation efforts that will occur. FHWA, Section 4(f) Policy Paper

at 5-6 (March 1, 2005).

In relation to transportation alternatives, an alternative is *infeasible* if, "as a matter of sound

engineering," that alternative cannot be constructed along the planned route. *Overton Park*, 401

U.S. at 411. An alternative is *imprudent* if there arises "unusual factors" or "cost or community

disruption" as a result of "extraordinary magnitudes" which counsel against building a highway

along such a route. *Id.* at 413. If no feasible and/or prudent alternative is available, the FHWA must

also find that the plans for the project minimize the harm to the protected 4(f) resources. *Id.* at 411;

*Hickory I*, 893 F.2d at 60. Furthermore, if there are two alternatives that cause substantially equal

harm to 4(f) resources, then the agency is free to choose either of those alternatives. *Coalition on*

*Sensible Transp. Inc. v. Dole*, 826 F.2d 60, 65 (D.C. Cir. 1987); *see Druid Hills Civic Ass'n v. Fed. Hwy. Admin.,* 772 F.2d 700, 716 (11th Cir.1985).

The Supreme Court has developed a three-step analysis for a court to review a Secretary's decision to use resources protected under 4(f). *Overton Park*, 401 U.S. at 416-417; *Hickory I*, 893 F.2d at 61. First, the reviewing court determines whether the Secretary acted within the scope of this authority. This requires that the Secretary understand that the scope of his or her authority was limited to approving a use of land where there were no feasible and prudent alternatives and all possible planning had been undertaken to minimize the harm to the 4(f) resource. *Id.* at 416; *Hickory I*, 893 F.2d at 61. Second, the reviewing court must determine that the Secretary's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" based on the relevant factors. *Id.* A searching and careful inquiry must be made; however, the reviewing court is not to substitute its own judgment for that of the agency. *Id.* Third, the court must determine whether the Secretary followed the necessary procedural requirements. *Id.* at 417; *Hickory I*, 893 F.2d at 61.

The Audubon Plaintiffs make three main challenges under Section 4(f). They assert that Defendants' 4(f) determination that there are no feasible and prudent alternatives to the Selected Alternatives is wrong and the certification that all possible steps have been taken to minimize the harm to protected land is not supported by the record. Second, the Plaintiffs' challenge the "use" analysis of the two Build Alternatives and the constructive use impacts for the Selected Alternative. Lastly, Plaintiffs challenge the mitigation plan and the minimization of harm analysis as being inadequate under the mandate of the statute.

   *1. Complete Avoidance*

Both the highway system and the park system in Maryland were jointly planned by the same agency, the Maryland-National Capital Park and Planning Commission ("M-NCPPC"). This agency, *in all of its infinite wisdom*, has planned the parks and designed the highways to traverse laterally through those parks. The proposed ICC project is an east-west highway that, according to the plan developed by the M-NCPPC, would cross several north-south parks. This configuration, a system of north-south parks crossed by major east-west limited access highways, has been modified slightly over the decades with community and public input, but the original plan has been reaffirmed and implemented through planning, development, and land preservation efforts. In reviewing the record and the agency's decision-making, this type of planning should be afforded significant weight. ROD at 90.

Keeping this in mind, the FHWA attempted to find alternatives that would avoid 4(f) resources, but concluded that there were no prudent and feasible alternatives that would completely avoid 4(f) lands to meet the purpose and need statement. The No-Build Alternative would completely avoid 4(f) lands, since the project would not be implemented. However, the No-Build Alternative would not address any of the project's stated purposes and needs, and it, therefore, was rejected as "imprudent" by the Secretary.[2] Alternatives that do not solve or meet transportation needs of a project can be rejected as "not prudent." *Hickory Neighborhood Defense League v. Skinner (Hickory II)*, 910 F.2d 159, 164 (4th Cir. 1990) (in approving highway project, Secretary may reject as imprudent alternatives that will not solve or reduce existing traffic problems); *Neighborhood Ass'n of the Back Bay, Inc. v. FTA*, 463 F.3d 50, 65 (1st Cir. 2006); *see also Druid Hills Civic Ass'n v. Fed. Hwy. Admin.*, 772 F.2d 700, 715 (11th Cir.1985).

_____

[2] While the No-Build Alternative was properly rejected as "imprudent," it obviously cannot be deemed "infeasible" within the meaning of Section 4(f)(1), since, as a matter of sound engineering, it is clearly possible to maintain an existing highway.

Similarly, combinations of improving existing roads, increases in transit service, and changes in land use were also considered but rejected as imprudent because they would only provide minimal transportation benefit, and even if they were prudent, they would necessarily use some of the region's north-south parks.  ROD at 99.  An "alternative that does not effectuate the project's purposes is, by definition, unreasonable, and [the agency] need not evaluate it in detail under 4(f)." *City of Bridgeton v. F.A.A.,* 212 F.3d 448, 461 (8th Cir.2000); *see also Ringsred v. Dole*, 828 F.2d 1300, 1304 (8th Cir. 1987).  There were several other alternatives that would avoid 4(f) resources, but Defendants concluded that these alternatives were not prudent, since they too would not meet the project's stated goals.  ROD at 99; FEIS, Vol. 1, at V-2-3.  Plaintiffs claim that their suggested alternatives, such as the Convert to HOT Lanes-Express Bus Alternative and the Add Toll Lanes-Express Bus Alternative, would not require the use of 4(f) lands, but they seem to brush aside the failure of these alternatives to meet the objectives of the project.  Also, Plaintiffs claim that the Upgrade Existing Roads Alternative would avoid 4(f) land, but Defendants concluded that this alternative would use portions of twenty-two 4(f) properties.  FHWA at 02609-11.  Plaintiffs make no claim or argue otherwise that Defendants erred in eliminating these alternatives as imprudent.

In considering over seventy (70) combinations of alternatives along both Corridors, the FHWA adopted a two-step approach to evaluating the two Build Alternatives, Corridor 1 and Corridor 2.  First, the Agency reviewed individual sets of options and sub-options along both corridors, resulting in a single set of options for Corridor 1 and two sets of options for Corridor 2 – 2AX and 2DB.  In the second step, the Agency compared all three options, considered the uses and the harms to the respective 4(f) resources, and eventually selected Corridor 1. ROD at 44-45, 100; *see also* FEIS, Vol. 1 at V-7-10.

The Agency identified fourteen 4(f) resources[3] in the Study Area that would be impacted by the ICC, including parkland and historic sites, which are described in detail in Section V of the FEIS.  From the extensive FEIS and the ROD, it is clear that the alternatives selected by the Defendants for detailed study, or any combination of them, could not completely avoid 4(f) lands, considering the current land use and development patterns of the Study Area.  Also, while some of the alternatives suggested by the Plaintiffs would have completely avoided 4(f) lands, they do not fulfill the basic purpose and needs of the ICC, and thus were properly rejected by the Secretary. *Hickory II*, 910 F.2d at 164 (reasoning that "alternatives [that] would not fulfill the transportation needs of the project" are "properly rejected . . . as imprudent."); *Neighborhood Ass'n of the Back Bay, Inc.*, 463 F.3d at 65.  Also, full avoidance is not always possible, and the Court recognizes that 4(f) is not a bar to using these lands.  The Secretary determined that complete avoidance of 4(f) lands was not prudent (not necessarily infeasible), and this was enough grounds for the Secretary to reject them.  The Court cannot find that this decision was arbitrary and capricious.

### 2. *"Use" Analysis*

Plaintiffs additionally challenge Defendants analysis under section 4(f)(2) in that they gave a disparate and inconsistent "use" analysis to the two alternatives considered.  Under the regulations, 23 C.F.R. 771.135(p)(1), a "use" of section 4(f) land occurs in one of three circumstances:

1. When land is permanently incorporated into a transportation facility;
2. When there is a temporary occupancy of land that is adverse in terms of the statute's preservationist purposes as determined by the criteria in [23 C.F.R. §771.135(p)(7)];
3. When there is a constructive use of land.

23 C.F.R. §771.135(p)(1).

---

[3] Some of these include the Mill Creek Stream Valley Park, Rock Creek Regional Park, North Branch Stream Valley Park, Layhill Local Park, Northwest Branch Recreational Park, Edgewood II, Upper Paint Branch Stream Valley Park, Holland Store and James Holland House and several others. *See* ROD at 92.

A "use" may occur where the impacts from the selected feasible and prudent alternative are unavoidable and minimized to the greatest extent possible.  23 C.F.R. §771.135; *Hickory II*, 910 F.2d 159, 163-64 (4th Cir. 1990).  It is axiomatic from the regulation that in the absence of a constructive use of a 4(f) resource, then that resource is *directly* used by a project.  *See also* FHWA Section 4(f) Policy Paper at 10 (March 2005) [FHWA 110500] ("Constructive use is only possible in the absence of permanent incorporation or temporary occupancy of the type that constitutes a use of 4(f) land by a transportation project.").

If it is determined that a direct use of land is occurring, then the inquiry leads immediately to a consideration of "all possible planning to minimize harm" to 4(f) resources, which includes measures to address harms resulting from indirect effects as well. *Overton Park*, 401 U.S. at 411; *Hickory I*, 893 F.2d at 60; *see* ROD at 128.

Plaintiffs insist that the Defendants did not treat both Build Options equally in the overall use analysis.  The Court disagrees.  What appears more probable to the Court is that with the different alignments of both Corridor 1 and the two sub-options of Corridor 2, different properties would be affected.[4]  If a particular route does not affect the same resources or property as another route, it would be a waste to consider the same properties if only one of them would be affected by one of the routes.[5]

   *3. Constructive Use Analysis*

---

[4] For a list of properties within the vicinity of the Study Area, *see* FEIS, vol. 1, at V-10-11, and V-24-26.
[5] The final list of 4(f) properties "used" by the Selected Alternative are small portions of Mill Creek Stream Valley Park, Rock Creek Regional Park, North Branch Stream Valley Park, Layhill Local Park, Northwest Branch Recreational park, Northwest Branch Stream Valley Park-Unit 5, and Upper Paint Branch Stream Valley Park.  The Selected Alternative does not use any historic property. ROD at 70; FEIS, vol. 1 at V-62.

Plaintiffs also claim that the "constructive use" analyses of the alternatives were treated differently, and that several parklands were not studied with respect to the Selected Alternative. A "constructive use" occurs when:

> [T]he transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished.

23 C.F.R. §771.135(p)(2). Examples of constructive uses include noise increases, substantial aesthetic impairment, restriction of access, vibration impacts, and ecological intrusions, among others. It should be noted that constructive use determinations are rare, and that the impacts outlined in (p)(4) should be carefully examined. If it is determined that the proximity impacts do not cause a substantial impairment, the FHWA can reasonably conclude that there is no constructive use. FHWA Section 4(f) Policy Paper (March 2005) FHWA 110500 at 11. Additionally, as the Ninth Circuit has held, a constructive use *does not occur* when a park and a transportation facility are jointly planned. *Sierra Club v. Dept. of Transp.*, 948 F.2d 568, 573 (9th Cir. 1991); *see* 23 C.F.R. §771.135(p)(5)(v).

Plaintiffs have the burden of demonstrating that there is a constructive use of a protected park or recreation area. *Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs.*, 374 F.Supp. 2d 1116, 1153 (S.D. Fla. 2005); *Geer v. Fed. Hwy. Admin.*, 975 F.Supp. 47, 42 (D. Mass. 1997). Plaintiffs must show that "the project's impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired." 23 C.F.R. 771.135(p)(2). Mere proximity to a resource is not enough for a constructive use to be present; they must show substantial impairment. *Florida Keys*, 374 F.Supp. 2d at 1153

41

(holding that plaintiffs "failed to demonstrate that any protected lands or resources will be substantially impaired as a result of the project").

Plaintiffs have the burden to show substantial impairment under the statute, and conclusory statements to that effect simply will not pass muster without any real evidence.  Plaintiffs allege that properties not directly used would be constructively used by the alignment of the Selected Alternative, but they do not show exactly how or in what manner these resources would be used.

Most of the parkland in the study area was planned along with the transportation project, with the M-NCPPC reserving corridors of land for the future ICC right-of-way, referred to as Designated Transportation Areas ("DTA").  Since the DTAs and parks were planned concurrently, the actual construction of the ICC within the DTAs is neither unexpected nor an impairment of the park.  The record reflects that Defendants were mindful of the underlying principle "that a reservation of a corridor for a future highway reflects the park owner's intention to accept not only the direct impacts on the land within the corridor, but also the indirect impacts that will necessarily result from constructing a highway in that location." ROD at 127; *see also* FHWA Section 4(f) Policy Paper at 21 (March 2005) [FHWA 110500].

In this case, where parklands and transportation projects have been jointly planned by the M-NCPPC, the eventual construction of the project is not a constructive use of the park.  *Sierra Club*, 948 F.2d at 575 ("where a park and road are jointly planned on land which previously had neither park nor road, . . . the community is not changing its mind about the park and type of road it would have, but is making that determination in the first instance.  It is difficult to see, therefore, how the road would significantly and adversely affect the park."); *see also* 23 C.F.R. 771.135(p)(5)(v).

A second reason for not performing a constructive use analysis is that it is not needed if a property is directly used by a highway project. Once a direct use is found, then the evaluation switches to an analysis of the harms and the possible considerations to minimize those harms. *Overton Park,* 401 U.S. at 411. FHWA Section 4(f) Policy Paper at 7-8 (March 2005) [FHWA 110500]; ROD at 128.

Plaintiffs maintain that the Agency was wrong to perform an analysis of only one park for constructive use – Fairland Regional Park[6] – and ignore three other parks that were proximate to the Selected Alternative in its 4(f) determination – Redland Local Park, East Norbeck Local Park, and Little Paint Branch Stream Valley Park. The Court disagrees inasmuch as these parks were considered in the 4(f) analysis. First, Plaintiffs did not identify any proximity impact of any kind on any of these resources, thus failing to carry their burden of proving that the proximity impacts would substantially impair the features, activities, or attributes of the park. Second, the Defendants did consider each of these parks and concluded that a constructive use did not exist. Moreover, FHWA is not required to determine that any particular 4(f) resource will *not* be constructively used by a project. 23 C.F.R. 771.135(p)(3).

The Section 4(f) evaluation did include an in-depth analysis of the potential for constructive use of protected resources in proximity to both Corridor 1 and Corridor 2. FEIS Vol. 1, at V-125-164. The agency identified twelve 4(f) resources in the proximity of both Corridors and determined that there would be no substantial impairment, except for the Free Methodist Church Camp Meeting Ground. *See infra.*

It was determined that Fairland Park would only be affected by Corridor 2. For a constructive use to occur, it must be determined that there would be a *substantial impairment* of the

---

[6] Plaintiffs do not challenge the validity of the constructive use analysis of Fairland Park.

resource. 23 C.F.R. 771.135(p)(2).  In this case, the record supports Defendants' determination that

no substantial impairment would occur with Fairland Park.  The park includes athletic facilities, i.e.

tennis courts, softball fields, batting cages, a picnic area, and a pool.  In performing a noise

assessment, the Agency properly concluded that the park "does not contain features or provide

activities that are especially sensitive to noise, and the park is not of a nature such that quiet and

serenity contribute in substantial part to its significance." FEIS V-138.  It was concluded that the

increase in noise level, which does not exceed the noise abatement criteria as set by FHWA, would

not substantially impair the features or attributes of the park. *Id.*  Also, it was found that the visual

impacts did not rise to the level of substantial impairment since the "recreational activities available

at this park are not sensitive to the visual quality of the environment outside the park boundaries."

*Id.*

    With respect to Redland Local Park and East Norbeck Local Park, the record supports the

Defendants' determination that the distance separating the parks from Corridor 2 would not

substantially impair the parks' features, and therefore a constructive use analysis was not needed.

RTC III-210-211.  The Little Paint Branch Stream Valley Park was jointly planned with the ICC,

and according to the Agency regulations, a constructive use would not occur here, which would

obviate the need for a constructive use analysis. RTC at III-211.

    Furthermore, Plaintiffs have not shown or provided the Court with any analysis of proximity

impacts to the above-named parks.  Plaintiffs' challenge appears to amount to a disagreement with

the Agency's determination without providing specific evidence showing otherwise.  As long as

"serious consideration of the appropriate factors is reflected in the record, this Court is empowered

only to accept the agency's determinations." *Citizens for the Scenic Severn River Bridge, Inc. v.*

*Skinner*, 802 F.Supp. 1325, 1334 (D. Md. 1991), *aff'd*, 972 F.2d 338 (4th Cir. 1992) (upholding the

constructive use determination).  The role of this Court is not to "referee disagreements" between the parties; "rather, the role of the Court is to assure adherence to the laws established to assure fairness and produce reasoned results." *Id*. at 1337.  The Court finds that Defendatns did indeed adhere to the mandates of Section 4(f).  Plaintiffs have failed to meet their burden of showing a constructive use of any of these parks, and thus, the Defendants' determination was not arbitrary and capricious.

### 4.  *Harm to 4(f) Resources*

Lastly, Plaintiffs challenge the harm minimization analysis and mitigation efforts of the Agency.  They claim that the mitigation plan is functionally and geographically inadequate to mitigate the environmental harms expected to be caused by the Selected Alternative.

Section 4(f)(2) allows the use of protected land for a transportation project if the "project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. §303(c)(2); 23 C.F.R. 771.135(a)(1)(ii). The Agency compared the harm to the protected resources for Corridors 1 and 2. ROD at 110-118. In terms of the amount of 4(f) acres "used," the Selected Alternative uses 88.1 acres, Corridor 2AX 32.4, and Corridor 2DB 47.9. ROD at 104-05.  When looking more than simply at the numbers, the Agency made several comparative findings.  The impacts to the parklands from Corridor 1 are consistent with park owner M-NCPPC's original vision and current plans for all of these parks. ROD at 111.  Also, the majority of the disparity in the acreage resulted from the decision to shift the alignment of Corridor 1 outside the reserved corridor.  *Id.*  It was found that approximately 16 acres of the use caused by Corridor 1 results from the incorporation of temporary measures that will help to reduce the impact of the highway.  *Id.* at 112.

The record reflects that construction of either of the Corridor 2 alternatives would impact several properties designated by M-NCPPC as planned future parkland because they are in close proximity to important natural resources, whereas Corridor 1 avoids these properties altogether. For example, construction of Corridor 2AX, which would use the smallest acreage of 4(f) land of any alternative, would adversely affect the historic Free Methodist Church Camp Meeting Ground, which is particularly sensitive due to the type of activities held there.  *See* ROD at 112.  It is also one of the last remaining resources of its kind in Maryland or Virginia, providing a serene, forested outdoor setting that is essential to religious retreats and meditation.  Noting the significance of this resource and the potential disruption to it by Corridor 2, it was not chosen, and this decision does not appear to be unreasonable.  *See* ROD at 112-113.

Lastly, the record indicates that the impacts to parkland associated with all of the Build Alternatives would be overwhelmingly mitigated, resulting in a substantial net increase in the size of the park system, and will collectively support the natural resource values associated with the parkland.  As a result of these efforts, the harm to parkland under each alternative would be neutralized by the proposed mitigation and, in some cases, would even improve upon the existing conditions of the resources.  *See* ROD at 113.

With regard to historic resources, the record shows that Corridor 1 would avoid all historic property but would only adversely affect two properties – Cashell Farm and Willow Grove. Corridor 2AX would directly use (and adversely affect) two historic properties – Holland Store and James Holland House and the Alloway Site– and would have adverse effects on seven additional properties that would not be directly impacted.  The record also demonstrates that Corridor 2DB would directly use the same historic properties as 2AX but would have adverse effects on only six additional properties. *See* ROD at 114.  It is evident from the record that the Agency evaluated the

46

harm to these properties.   In this evaluation, the Agency noted that while the harm would be mitigated to the fullest extent possible, certain impacts could not be alleviated or easily mitigated as some impacts to cultural resources remove or diminish qualities that cannot be replaced. *See* ROD at 114.   The Agency concluded, for example, that the noise impacts to the Alloway Site and Cemetery, the Holland Store, and James Holland House could not be mitigated through the use of sound barriers without creating additional adverse visual impacts on these properties. Also, the location of an interchange and a park and ride lot at Layhill Road would result in traffic passing in the vicinity of the Holland Store and James Holland House. *Id.* at 115.

There were also additional factors that the Agency considered that presented Corridor 2AX and 2BD with "unique and unusual" problems.   These included severe disruption of land use control, sprawl development, impacts to the county's agricultural heritage, more residential displacements, greater harm to historic resources, limited mobility benefits, and greater impacts to the Patuxent River and Rocky Gorge drinking water reservoirs.   The problems with both of these alternatives taken together as a whole would render either of these selections imprudent, and thus the Agency rejected them. ROD at 116-117.

The Agency concluded that in considering all appropriate factors concerning 4(f) resources, including the plans and judgments of the jurisdictional officials of the affected resources, all proposed mitigation, and the proposed environmental stewardship features, the harm to 4(f) resources would be substantially equal for all three corridors. ROD at 115.  The Court finds that this decision was a reasonable conclusion and not arbitrary and capricious.

Plaintiffs allege that the conclusion that the Build Alternatives would result in "substantially equal harm" and that the mitigation package "minimizes harm" is not supported by the record.  In support of this, they say that 459 acres of the compensation package is represented by the Casey

Property at Hoyles Mill, which is located outside the study area and in a separate watershed from the parkland impacted by the ICC. Additionally, the "potential reforestation" sites created by the Agency are not capable of supporting forest interior dwelling spaces ("FIDS") and the distance of the mitigation sites are not mitigation at all.

Plaintiffs are correct that the Casey Property is not within the Study Area. While this is the case, the property will nevertheless still add a substantial amount of replacement parkland, to the sum of 458.8 acres. This property will also contribute to 10.4 acres of wetlands, 9,401 linear feet of streams, 340.8 acres of forest, and 214 acres of existing FIDS habitat. FEIS, Vol. I at V-63. Also, the package includes the Dungan Property North, which will provide 44.9 acres of replacement parkland, 738 linear feet of streams, 20 acres of forest, and 24.5 acres to be reforested; the Llewellyn Property, which will provide 23.3 acres of replacement parks, including baseball, softball, and soccer fields; Peach Orchard Allnutt Property, which will provide 118 acres of parkland, 15.9 acres of wetlands, 2,100 linear feet of streams, and 28.3 acres of forest, in addition to other parkland replacement properties. FEIS Vol. 1 at V-62-63.

  *5. Mitigation*

Mitigation and minimization of harm is not explicitly defined in the statute; however, the FHWA has explained that "mitigation measures involving public parks, recreation areas, or wildlife and waterfowl refuges may involve a replacement of land and/or facilities of comparable value and function, or monetary compensation which could be used to enhance the remaining land." FHWA Section 4(f) Policy Paper at 7-8 (March 2005) [FHWA 110500]. Under Section 4(f)(2), the Secretary must "utilize a balancing process that totals the harm caused by each alternative so that an option can be selected which does the least total harm." *Druid Hills Civic Ass'n,* 772 F.2d at 716.

48

Plaintiffs point to no authority requiring the mitigation to be exactly identical to what is lost by the project or a particular method that constitutes "appropriate mitigation." Under § 4(f), an agency's determinations "that a particular plan minimizes harm to historical sites [or parkland] deserves even greater deference than agency determinations concerning practicable alternatives." *Conservation Law Found. v. Fed. Hwy. Admin.*, 24 F.3d 1465, 1476-77 (1st Cir. 1994). The only relevant factor in making a determination whether an alternative route minimizes harm is the quantum of harm to the park or historic site caused by the alternative. Considerations that might make the route imprudent, e.g., failure to satisfy the project's purpose, are simply not relevant to this determination. *Louisiana Envtl. Society, Inc. v. Coleman*, 537 F.2d 79, 86 (5th Cir. 1976). If the route does not minimize harm, it need not be selected. The Secretary is free to choose among alternatives which cause substantially equal damage to parks or historic sites. *Id.* Plaintiffs bear a heavy burden in challenging an Agency's decision as to harm minimization. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 204 (D.C. Cir. 1991).

The record suggests that the planning for the ICC project included extensive engineering efforts designed to minimize harm to 4(f) resources wherever possible. These include alignment shifts, narrower medians, underground stormwater management facilities, elongated bridges, steeper side slopes, and other measures designed to lessen the effect of the Build Alternative. ROD at 20-32, 105-106; FEIS vol. 1 at V-20-24, 50-59. The $370 million comprehensive mitigation package included mitigation and stewardship activities that would even enhance section 4(f) properties. ROD at 20. The total package will add 20,700 linear feet of stream restorations, three fish blockage removal projects that restore 1,500 linear feet of streams, creation of 83 acres of wetlands, 25 wildlife passage improvements, 776.6 acres of new parkland, and seven reforestation sites. *Id.* Not

to be swayed by sheer numbers alone, the Court is convinced that the mitigation package for the project does adequately minimize the harm resulting from the Selected Alternative.

The record for the 4(f) evaluation discloses for each mitigation property the location, size, and the environmental values which it contains, including streams, forests, interior forests, wetlands, and recreation areas, among others.  *See* FEIS vol. 1 at V-62-64; ROD at Attachment. D.  The Agency described its approach to mitigation for parkland that addresses the "functions and values of the impacted lands."  ROD at 106.  The mitigation also included measures to "replace and enhance natural resources within parks where preservation of environmental resources and stream valley protection are key functions of the park." *Id*.  It also includes replacement of "recreational amenities such as soccer and baseball fields in parks where these facilities are impacted." *Id.*  Lastly, for historic sites, mitigation included measures that were specific to the actual historic sites. *Id.*  For these reasons, Plaintiffs have not met their burden to establish a violation of 4(f).

6. *Environmental Stewardship*

In addition to the mitigation measures, Defendants have undertaken an extensive package of environmental stewardship projects.  The proposed activities focus on two general areas: watershed resources and community facilities.  These measures were intended to address the stresses to the natural, cultural, and socio-economic environment caused by past development in the area, above and beyond the measures that are required to mitigate the impacts of the ICC project. ROD at 110.  The Selected Alternative includes sixty-three environmental stewardship activities that will incorporate relief measures in the Study Area to diminish the effects of previous development in the area.  Also, it is worth reiterating that environmental stewardship is an element of the ICC's purpose and need statement.[7]  ROD at 14-16.

---

[7] While the Selected Alternative includes construction of the all of the proposed activities, none have yet been planned in detail, but the Agencies are committed to constructing these projects. ROD at 110.

*7. Coordination*

Finally, in terms of coordination, the Court is favorably impressed with the mound of evidence in the record demonstrating how the Defendants closely coordinated with all appropriate state and local agencies in adequately identifying potentially impacted 4(f) properties. These agencies included M-NCPPC and Washington Suburban Sanitary Commission ("WSSC"),[8] the Maryland State Historical Preservation, the Maryland Historical Trust, and the U.S. Department of the Interior ("DOI").[9] The DOI reviewed the 4(f) Evaluation included in the Final EIS, and concurred the approval of Corridor 1 as being consistent with the mandates of §4(f), and the DOI was satisfied with its handling of the constructive use issues as well. ROD at 119-120.

After close consultation, M-NCPPC approved the mitigation package. They found that the mitigation package "maintains the integrity of the state system" and some of the replacement properties, i.e. Casey, Llewellyn, Dungan, McNeill, etc., "meets and in many aspects exceeds the land compensation necessary." FHWA 131149 at 131150; *Letter*, D. Berlage (M-NCPPC) to N. Pedersen (SHA), Sept. 21, 2005. *See also* FHWA 178498 at 178499, *Letter*, Hamer (M-NCPPC) to Pedersen (SHA), May 15, 2006, concurrence with 4(f) addendum.[10]

Also, the DOI concurred in the mitigation package, finding that the "mitigation package provides replacement parkland that closely replicates the parkland that will be impacted in terms of providing FIDS habitat, mature forest adjacent to stream valleys and contiguous to public parklands, wetlands, floodplains, and plant and wildlife habitat." FHWA 148862 at 148863, Letter W. Taylor

---

[8] The M-NCPPC and the WSSC are owners of these parks.

[9] Section 4(f) also requires that the Section 4(f) Evaluation be provided for coordination and comment to the Department of Interior. *See* 49 U.S.C 303(b); 23 C.F.R. 771.135(i).

[10]It must be noted that one of the Commissioners was unsatisfied with the definition of parkland and that the criterion of "forest interior loss" did not satisfy the environmental equivalency standard as required by the MOU between the agencies. However, the mitigation package was still approved by the Commission. FHWA 131149 at 131150.

(DOI) to N. Castellanos (FHWA), Feb. 24, 2006. (also, Letter, Taylor to Castellanos, concurrence with the 4(f) addendum, FHWA 178489, May 16, 2006).

Because of the reasons stated above, the Court finds that the Defendants' evaluation and mitigation package under §4(f) was not arbitrary or capricious.

### C.   Clean Water Act (CWA)

The Clean Water Act ("CWA") establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §1251(a).  To achieve this goal, the CWA prohibits the discharge of pollutants into the waters of the United States unless it is authorized by a CWA permit. *Id.* at §1311(a).

Because the ICC requires the placement of fill material in waters of the United States, a CWA permit was needed.  The ANS Plaintiffs bring a claim under the CWA challenging the issuance of the CWA permit.  Basically, Plaintiffs are repeating their arguments from before, in that because the Corps relied on an EIS that was faulty, deficient, and arbitrary and capricious, the resulting permit cannot stand.  Since the Court has earlier held that the EIS was not done in an arbitrary and capricious manner, Plaintiffs' argument also fails.  However, the Court will properly analyze their claims.

Section 404 of the CWA authorizes the Secretary of the Army, through the Corps of Engineers, to regulate discharges of dredged and fill material into jurisdictional "waters of the United States" through permits. 33 U.S.C. §1344.  The Corps issues such permits under the guidance and requirements imposed by the Corps' regulations, 33 C.F.R. §§320.1 *et seq*., as well as the EPA's §404(b)(1) Guidelines ("Guidelines"), 40 C.F.R. §230.1 *et seq.*  Individual permits are issued on a case-by-case basis after certain criteria are met: a resource-intensive process that involves extensive site-specific documentation and review, an opportunity for public hearing, and a public interest

review.  Then, it concludes with a formal determination of whether to grant or deny a permit.  The Guidelines specify that the Corps must ensure that the proposed fill material will not cause any significantly adverse effects on human health; welfare, aquatic life, and aquatic ecosystems; or recreational, aesthetic, or economic values. 40 C.F.R. §230.10(c)(1)-(4).

EPA's 404(b)(1) Guidelines generally prohibit issuing permits for projects where there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. §230.10(a); 33 C.F.R. §320.4(a)(2)(ii).  To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. §230.10(a)(2).

The Guidelines also provide that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystems." *Id.* at §230.10(d).  The Corps has the ability to reduce the potential adverse impacts associated with a filling activity by imposing conditions on the permit, such as requiring mitigation for any loss as a result of the filling. 33 C.F.R. §325.4(a)(3); *see also* 33 C.F.R. §320.4(r)(1).  Mitigation includes steps to avoid or minimize an impact of the proposed action and to "compensate for the impact by replacing or providing substitute resources or environments." 40 C.F.R. §1508.20(e).

Although the Corps encourages mitigation efforts, it is generally reluctant to permit discharges initially.  Before any approval of a permit by the Corps, there is a general presumption against discharge into U.S. waters for non-water-dependent activities. *Hough v. Marsh,* 557 F.Supp. 74, 82 (D. Mass 1982) (arguing that a "general presumption against all discharges into aquatic

ecosystems with a specific presumption that practicable alternatives to the fill of wetlands exist");
see *Buttrey v. U.S.*, 690 F.2d 1170, 1180 (5th Cir. 1983).

Plaintiffs essentially make three arguments to the issuance of the CWA permit.  First, they argue that the Corps did not "critically and independently" assess the purpose and need statement, the reasonable alternatives suggested, or the impacts on aquatic resources.  Second, the Corps' determination that the selected alternative was the least environmentally damaging practicable alternative rested upon the Corps' acceptance of the flawed purpose and need statement in the EIS prepared by the FHWA.  Lastly, Plaintiffs argue that the public interest determination was not supported by the record and that the Corps substantially discounted the impacts of the Selected Alternative on the assumption that they will be mitigated or minimized through the mitigation plan.

During the permitting process, the Corps and SHA decided to merge the NEPA and 404 permit processes for highway projects because the FHWA demonstrated the similarities between the two evaluations.  Both required an alternatives analysis and an assessment of environmental impacts.  More importantly, there would be huge savings in time and resources that could be achieved by merging.  The major "impetus to participate in the merger came when the Corps realized it would have greater ability to ensure that the study included a meaningful analysis of alternatives if it became involved before the SHA had invested considerable resources in support of a particular outcome." USACE ROD 15036-37.

The Record of Decision ("USACE ROD") issued by the Corps shows that the Corps did in fact exercise independent judgment throughout the process and complied with all CWA and Corps regulations in issuing the CWA permit.  The USACE ROD explained the permit process, with a detailed impact analysis as well as a determination of the least environmentally damaging practicable alternative and its rationale for choosing it.  The USACE ROD also contains a

54

description of the compliance under §404 and the public interest determination.  The Corps had a distinct and separate process even though it did rely on the EIS from the FHWA.

*1.*

The Defendants applied for their CWA permit on October 1, 2004, and it was subsequently issued on June 13, 2006.  It was concluded that the Selected Alternative will impact 43,705 linear feet of jurisdictional streams, 44.5 acres of wetlands, and 1.8 acres of ponds. USACE ROD at 15181.[11]

Throughout the design and planning process for the ICC project, the Corps participated as a cooperating agency.  The Corps' reliance on the FHWA and its decisions is encouraged and even permitted under the regulations, primarily to channel resources and to eliminate needless duplication. 40 C.F.R. §1501.1(b).  It is standard practice for a district commander to adopt another federal agency's EIS after an independent review unless there is substantial doubt as to any technical or procedural inaccuracies or an omission of factors bearing heavily on the Corps' decision. 33 C.F.R. §230.21.; *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215 (11th Cir. 2002). Additionally, the Corps can adopt an EIS signed by the Lead Agency, provided that they undertake "an independent review of the statement" and determine that their "comments and suggestions have been satisfied." 40 C.F.R. §1506.3.

To implement the Executive Order 13,274 and the NEPA and CWA section 404 reviews, the agencies developed an "Adapted ICC Planning Process" ("Process"), which included elements of both federal and state requirements.  The Process established the Interagency Working Group ("IAWG"), which the Corps was a member, to conduct the environmental and aquatic study and

---

[11] The permit also authorizes the discharge of fill that will temporarily impact 671 linear feed of jurisdictional streams and 3.01 acres of wetlands during construction, but this will be restored at the completion of the project.

55

provide a steering committee of high level officials to make decisions to resolve issues arising from

the group.  The Corps approved the Process after evaluating each step and determined that it met the

necessary regulations.

### a. Purpose and Need Evaluation

The Corps participated in the development and review of the Purpose and Need statement,

conducted its own independent analysis, commented on draft proposals, and concurred in the final

purpose and need statement after it was satisfied that its comments were addressed.  Through the

IAWG, the Corps rejected several statements in the purpose and need as being overly restrictive or

unrelated to the purpose.  For example, one of the proposed purpose and needs that was rejected was

to "serve existing and future development patterns as contained in local land use plans." USACE

1328 at 1375.  Another proposed statement that was rejected was to "help restore the natural

environment from past development impacts in the area." *Id*.  The disapproval of several proposed

purposes in the purpose and need statement shows that the Corps *did* in fact make its own

independent assessment of the purpose and need statement and did not simply rubber-stamp the

proposed statement submitted by the Defendants.

Likewise, the Corps properly deferred to the FHWA with respect to issues particularly

related to transportation planning.  The Corps, among others, commented that the words "limited

access highway" would be too limiting and might preclude non-highway alternatives that might

otherwise address the study area's transportation needs. USACE 1566.  The Corps suggested an

"east-west transportation facility," but after consideration by the SHA and FHWA and those with

transportation expertise, it was determined that a limited access road facility could best meet the

project need, while not excluding various other alternatives. USACE 1762.  Deference was proper

here because Congress invested the U.S. Department of Transportation with the responsibility to

provide leadership in transportation planning issues, and it was proper for the Corps to defer to the FHWA on those issues. 40 U.S.C. §101(b).

The Corps did not concur at any part of the process until it was satisfied that their comments had been addressed, and the record shows that the Corps did exercise its independent judgment. However, as is mandated, it is clear that the Corps was also mindful that it could not ignore the purpose for which the applicant seeks a CWA permit and to substitute its own purpose and need statement for that of the actual proposed purpose and need statement. *Louisiana Wildlife Fed'n v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985).

### b. Reasonable Alternatives Evaluation

The Corps likewise took an independent review of the reasonable alternatives analysis in the EIS.  As a cooperating agency, the Corps considered independently each of the alternatives and concurred at each stage of project submissions.  A concurrence from the Corps is essentially an agreement "not to revisit the concurrence unless new or revised information surfaces that was not available at the time of the concurrence, and the new information warrants reconsideration" of that decision. USACE  15041.  Also, it would not be an efficient use of resources for the SHA and the FWHA to have spent arduous time on the Selected Alternative in the FEIS to wait until the last minute to say that it was not permittable. *Id*.  Even with this concurrence, the applicant is not quite out of the clear.  The permit decision is not yet final, since there are still other analyses that must be completed before a permit is authorized.  Draft alternatives were circulated between the agencies, and the Corps provided comments upon each of them.  In the end, the Corps was satisfied that the range of alternatives, from 300 to eighteen to the three retained for detailed study, was sufficient to pass muster under its guidelines. *Id.*  The Court agrees with the Corps.

c. *Aquatic Resources Evaluation*[12]

In regards to the aquatic resources, the Corps is the agency to which other agencies defer. USACE ROD at 2.  The Corps was a part of the development of the FEIS and exercised its independent judgment in assessing the impacts to aquatic resources.  The Corps identified the aquatic resources that would be affected by both build alternatives and analyzed their effects, along with other significant adverse environmental impacts to surrounding communities, parklands, and the natural environment that would occur as a result of the ICC.[13]  The Corps' conclusions were identical to those of the Lead Agencies, and they concurred in the EIS with the selection of the Preferred Alternative. USACE ROD at 7.  In reviewing the Corps ROD and the impacts analysis, the Court is convinced that the Corps did make an independent assessment of the impacts to aquatic resources from both alternatives.

2.

Next, Plaintiffs challenge the Corps' determination that the Selected Alternative represents the least environmentally damaging practicable alternative ("LEDPA").  As stated earlier, the 404(b)(1) Guidelines provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. §230.10(a).  An alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. §230.10(a)(2).  If a project that involves the filling of wetlands is not water dependent, the Corps must presume that practicable alternatives exist that do not impact

---

[12] Some of these aquatic resources include the Muddy Branch Watershed, the Upper Rock Creek Watershed, the Indian Creek Watershed, the Northwest Branch Watershed, the Paint Branch Watershed, the Rocky Gorge Reservoir, and the Trout Stream.

[13] *See* Corps ROD, pages 9-47 for the detailed analysis and response to comments.

wetlands unless the project applicant clearly demonstrates otherwise.  *Id.*  Also, the Guidelines require that "to the extent that practicable alternatives have been identified and evaluated ... [in] other planning process[es], such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines." 40 C.F.R. §230.10(a)(5).

As stated earlier, since the Corps was a cooperating agency in the development of the EIS, it participated and considered the practicable alternatives as identified in the DEIS when it conducted its LEDPA analysis.  The Corps was satisfied that the initial array of 300 alternatives, which was narrowed down to eighteen, satisfied the practicable alternatives analysis as required under the Guidelines.  Through the record and its participation in the IAWG, the Corps considered the alternatives that would satisfy the purpose and need statement and that none of the alternatives would completely avoid impacts to aquatic resources. USACE ROD at 48.  From this analysis, the Corps analyzed the impacts from Corridor 1 and Corridor 2 on aquatic resources, forests, community impacts to homes, businesses and historic sites, and secondary and community impacts resulting from those alternatives.  From this, the Corps found that Corridor 1 was the LEDPA.  This was based primarily on the relative importance of the two highest quality aquatic resources in the study area that would be affected – the trout stream for Corridor 1 and the Rocky Gorge Reservoir for Corridor 2.

The Rocky Gorge Reservoir was found to be more important for protecting than the trout stream, and the Court agrees.  It currently provides the drinking water supply for 550,000 to 650,000 people; the reservoir is more important to the public interest than the trout stream.  This determination of relative importance, however, does not render the trout stream inconsequential; the SHA has proposed measures that would avoid significant degradation to the trout stream and preserve that aquatic resource.  USACE ROD 68.  While the Court is genuinely concerned about the

care and well-being of these hapless trout, it is more concerned about the drinking water supply for this highly populated area.  The Corps' record is replete with findings and responses to comments that support their decision, and the Court finds that their decision was based and sufficiently supported by the administrative record.

     *3.*

     Lastly, the Plaintiffs challenge the fact that the determination of the Selected Alternative as in the public interest was not supported by the administrative record.  They allege that the Corps substantially discredits the impacts of the Selected Alternative on the basis that the impacts to parklands, FIDS habitats, wetlands, and other resources would be substantially minimized by the mitigation package proposed by the SHA.  They ultimately disagree with the balance struck by the Corps as to the factors to consider for the public interest determination.

     The Corps will grant a permit application "unless the district engineer determines that [doing so] would be contrary to the public interest." 33 C.F.R. §320.4(a)(1); *see also* 33 C.F.R. §323.6(a).  In conducting a public interest review, the Corps balances "benefits which reasonably may be expected to accrue from the proposal" against the "reasonably foreseeable detriments." *Id*.  The decision to grant or deny a permit will reflect "national concern for both protection and utilization of important resources." *Id.*

     The Corps' public interest review is the main framework for the overall evaluation of projects.  Rather than focusing on the aquatic resources, the evaluation involves an examination of the projects in light of the general public interest.  The Corps collects comments from the public and other agencies and experts, conducts public hearings, holds interagency meeting, and reviews all the relevant material to set the basis for its own public interest review of a proposed action.  This review "requires the careful weighting of all those factors to the extent they are relevant in the particular

case."[14] 33 C.F.R. §320.4(a)(1).  The benefits "which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." *Id.*  Lastly, this decision "should reflect the national concern for both protection and utilization of important resources." *Id.*

The specific weight given to each factor is determined by its importance and relevance to the particular proposal, and the importance of each factor varies with each project, as determined by the District Engineer. 33 C.F.R. §320.4(a)(2)-(3).  In all, the agency is in the best position to determine which impacts are relevant to performing the balance, but the court is expected to review the agency's determination for an abuse of discretion. *Overton Park,* 401 U.S. at 416.  In determining the relative weight to be assigned to the factors, the District Engineer is to give "full consideration and appropriate weight" to "all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise." 33 C.F.R. §320.4(a)(3). The balancing of all these factors enables the Corps to decide whether to issue a permit, and what conditions should be attached to it. 33 C.F.R. §320.4(a).

*4.*

While it is clear that Plaintiffs' challenge amounts, in effect, to a disagreement in how the Corps struck the balance of the relevant factors, it is equally clear that Plaintiffs do not convincingly argue that the Corps failed to consider the relevant factors.  The law only requires that the Corps consider the factors and make a determination based from that analysis. Also, the Corps did point out the costs and detriments associated with the environmental impacts of the Selected Alternative and the extent to which they would be minimized or mitigated.  For example, the Corps considered

---

[14] Some of these factors, including the cumulative effects thereof, include conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, consideration of property ownership and, in general, the needs and welfare of the people. 33 C.F.R. §320.4(a)(1).

how the highway would impact the tranquility and viewshed of the parks (ROD at 100), the aesthetic qualities and solitude of the parks (ROD at 100), the noise impacts (ROD at 94), the impact of dividing the Longmeade community (ROD at 95), and even the severe impairment of the State-endangered Trailing Stitchwort (ROD at 98). In addition to many other factors considered by the Corps, none of these factors individually are determinative in the overall review of the public interest.

Equally as important as the negative impacts to the environment are the mitigation efforts to minimize the harmful effects on the environment – another factor that is part of the overall balance. 33 C.F.R. §320.4(r)(1)(iii). The Corps' permit contains forty-six special conditions relating to avoidance and minimization of impacts, stormwater management, construction activities, erosion and sediment control, and monitoring project impacts. USACE ROD 15181-15200. Some of the mitigation measures include stream restoration sites, fish passage sites, wetland creation sites, and water quality mitigation sites. USACE ROD 15202-15204.

There is no requirement that the impacts should be completely offset by the proposed mitigation, nor do Plaintiffs cite to any authority which suggests that. The regulations require "appropriate and practicable steps" to be undertaken to minimize potential adverse impacts. 40 C.F.R 230.10(d). An alternative is "practicable" if it is "available and capable of being done after taking  into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. 230.10(a)(2). Contrary to Plaintiffs' assertions, the Corps did find that the minimization and mitigation proposals for the project were commendable and some measures taken by the state were "unprecedented in Maryland." USACE ROD at 106-107. Some of these mitigation efforts that exceeded previous proposals include: a state-of-the art linear stormwater management system that will filter stormwater (USACE ROD at 65); a $20 million for a study of new express bus

routes in the corridor (USACE ROD at 90); a 625-foot long landscaped deck over the highway through Winters Run, costing $21.8 million (USACE ROD at 92); $40 million for 7.5 miles of hiker-biker trails (USACE ROD at 93); and several other measures described in the record.

In conclusion, the Court must not read, as Plaintiffs seem to suggest at times, that the statute and the implementing regulations would require that nothing ever be allowed to be discharged into the waters of the United States. Such a narrow and closed-off reading is unacceptable. The Corps did consider all relevant factors and did independently assess the project. Plaintiffs would simply strike the balance the other way, which in this case, does not amount to a violation by the Corps, nor is that enough to render their decision and their ROD invalid under the law. The Corps is the "watchdog" of the environment, and it is their mission to protect the aquatic resources of the United States. The Court believes that they have undertaken their responsibility.

### D. Clean Air Act

#### 1. Legal Framework

##### a. The Clean Air Act and the Establishment of National Ambient Air Quality Standards

The Clean Air Act ("CAA") establishes a joint state and federal program to control the Nation's air pollution. The purpose of the CAA is to provide national standards on air pollution by requiring the Environmental Protection Agency ("EPA") to establish national ambient air quality standards ("NAAQS") for certain pollutants to protect public health and welfare. 42 U.S.C. § 7409. To date, the EPA has established NAAQS for six pollutants: ozone ($O_3$), carbon monoxide (CO), sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), particulate matter (PM), and lead. The EPA has established NAAQS for two types of particulate matter, which are known as PM10 (coarse particles) and PM2.5 (fine particles).

After promulgating NAAQS for a particular pollutant, the EPA must designate areas that meet the standard ("attainment areas") and those that do not meet the standard ("nonattainment areas"). *Id.* § 7407(d)(1).  The parties do not dispute that the Washington DC-MD-VA area is a nonattainment area for PM2.5.

### b. State and Federal CAA Conformity Requirements

#### 1. State Conformity Requirements for Nonattainment Areas: State Implementation Plans ("SIP")

The CAA provides that certain conformity requirements apply to nonattainment areas.  42 U.S.C. §7506(c)(5).  States undertake the means to implement, attain, and enforce the NAAQS through a State Implementation Plan ("SIP") in nonattainment areas. *Id at* § 7410(a)(1).  The EPA provides detailed instructions for states to follow in developing an effective SIP. *See id. at* §7410(a)(2).  The EPA requires SIPs to be implemented, "as expeditiously as possible." *Id.* at 7502(c)(1).

Each SIP identifies the total allowable pollutant emissions consistent with meeting the applicable NAAQS requirement.  Among other things, each SIP allocates that the total emissions allowable between stationary sources (*i.e.*, "any building, structure, facility, or installation" that emits or may emit relevant pollutants, 40 C.F.R. § 52.01(a)), on-road mobile sources (*i.e.*, highway and transit motor vehicles, *id.* at 40 C.F.R. § 93.101), and other source categories.  The allowable emissions allocated to "highway and transit vehicle use and emissions" is known as the motor vehicle emissions budget ("MVEB"). *Id.*

#### 2. Federal Conformity Requirements

The Federal-Aid Highway Act, as amended, provides the statutory basis for the Federal-Aid Highways Program ("FAHP"), a grant program for, among other things, the construction and

maintenance of highway systems to provide for local and interstate commerce. 23 U.S.C. §101(b). The FAHP, among other things, requires conformity with the requirements of the CAA before the FHWA can enter into a contractual obligation to fund a project.

The CAA states that no Federal Agency may "engage in, support in any way or provide financial assistance for, license or permit or approve any activity which does not conform to a[n implementation] plan" in effect under the Act. 42 U.S.C. § 7506(c)(1). Section 7506(c)(1) was amended by the 1990 CAA Amendments to define "conformity to an implementation plan" by adding specific statutory tests that the federal agency approving or funding an activity must satisfy before a project may be found to "conform." These include §(c)(1)(A), which requires "conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations," and the tests in (c)(1)(B) that require that a project will not "(i) cause or contribute to any new violation . . .; (ii) increase the frequency or severity of any existing violation…; or (iii) delay timely attainment of any standard."

Section 176(c)(2) of the CAA specifically requires conformity findings to be made for metropolitan transportation plans and programs and for individual transportation projects. 42 U.S.C. § 7506(c)(2). A Transportation Plan describes the policies and strategies for accommodating current and future travel demand, and a Transportation Improvement Program ("TIP") describes specific transportation projects that are consistent with the Transportation Plan. *See* 23 C.F.R. § 450. Transportation plans and TIPs are adopted by metropolitan planning organizations ("MPOs") at a regional level. *See id.*

In nonattainment and maintenance areas, after MPOs have individually determined conformity of their regional transportation plans and TIPs, the plans and TIPs are submitted to the FHWA and the Federal Transit Administration ("FTA") for review. The agencies determine

whether the applicable CAA conformity requirements have been met to ensure that transportation-related decisions are consistent with the purposes of the applicable SIP, including a determination of whether the proposed plan has a projected emissions that falls within the MVEB.  *See* 42 U.S.C. § 7506(c)(2).

### c.  *Project Level CAA Conformity Requirements: Hot-Spot Analysis*

Pursuant to 40 C.F.R. 93.123(b)(1)(i), "new or expanded highway projects that have a significant increase in diesel levels" are subject to a particular conformity analysis – hot-spot analysis.  The hot-spot analysis is used to ensure that an FHWA/FTA project will not cause or contribute to any new localized PM2.5 violations or increase the frequency or severity of any existing violations in nonattainment areas.  40 C.F.R. § 93.116(a).  The parties do not dispute that the Inter-County Connector project falls within the meaning of 40 C.F.R. 93.123(b)(1)(i) and, thus, requires a hot spot analysis.

The relevant regulation requires that the FHWA perform a quantitative analysis to demonstrate that the requirements in 93.116 are fulfilled; however, a quantitative analysis cannot be used "until [the] EPA releases modeling guidance on this subject and announces in the Federal Register that these requirements are in effect."  40 C.F.R. 93.123(b)(4). Instead, until the EPA establishes guidelines, the FHWA will complete a qualitative analysis.

Currently, no quantitative analysis requirements are in effect; thus, qualitative methods are used to perform hot spot analysis.  Section 93.123(c) provides general requirements for qualitative analysis:

> (1) Estimated pollutant concentrations must be based on the total emissions burden which may result from the implementation of the project, summed together with future background concentrations. The total concentration must be estimated and analyzed at appropriate receptor locations in the area substantially affected by the project.

66

(2) Hot-spot analyses must include the entire project, and may be performed only after the major design features which will significantly impact concentrations have been identified. The future background concentration should be estimated by multiplying current background by the ratio of future to current traffic and the ratio of future to current emission factors.

(3) Hot-spot analysis assumptions must be consistent with those in the regional emissions analysis for those inputs which are required for both analyses.

(4) CO, PM[10], or PM[2.5] mitigation or control measures shall be assumed in the hot-spot analysis only where there are written commitments from the project sponsor and/or operator to implement such measures, as required by § 93.125(a).

(5) CO, PM[10], and PM[2.5] hot-spot analyses are not required to consider construction-related activities which cause temporary increases in emissions. Each site which is affected by construction-related activities shall be considered separately, using established "Guideline" methods. Temporary increases are defined as those which occur only during the construction phase and last five years or less at any individual site.

More specifically, Congress directed EPA, with the concurrence of DOT, to "promulgate, and periodically update, criteria and procedures for demonstrating and assuring conformity in the case of transportation plans, programs, and projects." 42 U.S.C. §7506(c)(4)(B).

In a March 2006 rulemaking, the EPA announced that it would issue joint guidance (with FHWA) for conducting qualitative PM2.5 hot-spot analyses, and directed federal agencies to follow this guidance. 71 Fed. Reg. 12,467, 12471. The FHWA and EPA finalized this joint guidance on March 29, 2006. The guidance is entitled "Transportation Conformity Guidance for Qualitative Hot-Spot Analyses in PM2.5 and PM10 Non-Attainment and Maintenance Areas." ("Guidance") FHWA 157047-83. The Hot-Spot Guidance outlines in detail the steps needed for a qualitative analysis. *Id*. at 157067-70. The guidance does not require modeling or detailed data-gathering. It allows for a conformity finding to be based on a qualitative consideration of local factors. *Id*. at 157066-67. This procedure is known as the "monitor-comparison" method.

## 2. Jurisdiction Under the Clean Air Act

Plaintiffs seek to establish jurisdiction over the claim arising under the Clean Air Act ("CAA") and EPA's conformity rule under the citizen suit provision of CAA.  42 U.S.C. § 7604. The CAA permits any person to bring a civil suit against any person or government entity "alleged to have violated or be in violation of  . . .  an emission standard or limitation under this chapter . . . ."  42 U.S.C. § 7604(a)(1).  An "emission standard or limitation" is defined as "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard  . . . which is in effect under this chapter  . . .  or under an applicable implementation plan."  42 U.S.C. § 7604(f)(1).  Thus, as the First Circuit has held, citizen suit jurisdiction over a violation of the conformity provision is subject to a two-prong test: (1) the conformity provision must be a schedule or timetable of compliance, emission limitation, standard of performance, or emission standard; and (2) it must be in effect under this chapter or an applicable implementation plan.  *Conservation Law Found. v. Busey*, 79 F.3d 1250, 1258 (1st Cir. 1996).  The conformity provision under the CAA is indeed a provision "in effect under the Act;" therefore, it satisfies the second prong.  The main question for this Court is whether the conformity provision under the CAA qualifies as "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard," as these terms are defined by other provisions of the Act.

Plaintiffs argue that the conformity requirements constitute an emissions standard of performance, which is defined as "the quantity, rate, or concentration of emissions of air pollutants on a continuous basis ...." 42 U.S.C. §7602(k).  Plaintiffs contend that the conformity requirement meets this definition because it expressly requires Defendants to identify a permissible limit on the concentration of emissions of air pollutants from highways by demonstrating that the concentration resulting from the highway emissions do not exceed the permissible ambient levels in the area

affected by the project.  To justify the argument that the conformity requirements constitute an emissions standard of performance, Plaintiffs rely on *Conservation Law Found. v. Fed. Hwy. Admin.*, 24 F.3d 1465, 1477 (1st Cir. 1994).  Plaintiffs' reliance, however, appears misplaced.

The First Circuit revisited that issue two years later and determined that citizen suit jurisdiction does not extend to violations of the conformity provision.  *See Busey*, 79 F.3d at 1260. Following the First Circuit's ruling, other Courts have similarly held that the CAA citizen suit provision does not confer jurisdiction over claims involving violation of the conformity provision. *See Env. Council of Sacramento v. Slater*, 184 F.Supp.2d 1016, 1042 (E.D. Cal. 2000); *American Auto. Mfrs. Ass'n v. Cahill*, 53 F.Supp. 2d 174, 186 (D.N.Y 1999) (finding that a plaintiff must allege a violation of "a specific strategy or commitment in the [State Implementation Plan ("SIP")] and describe, with some particularity, the respects in which compliance with the provision is deficient, in order to state a claim under the citizen suit provision"); *Buckingham Twp. v. Wykle*, 157 F. Supp. 2d 457, 465 (D. Pa. 2001) (holding that there is no private right of action under the citizen suit provision of the Clean Air Act for the violation of the Act alleged by plaintiff under 42 U.S.C. § 7506 (c)); *Citizens of Georgetown v. City of Washington*, 175 U.S. App. D.C. 356, 535 F.2d 1318 (D.C. Cir. 1976) (holding that the CAA conformity determination does not fall within the definition of "emission standard or limitation," and therefore, that challenges to conformity determinations may not be brought under the citizen suit provision).

In light of the clear-cut case law on this issue, this Court agrees with Defendants and finds that it does not have jurisdiction over Plaintiffs' CAA claim under the citizen suit provision. Therefore, the Court's review of the Conformity Determination is limited to the APA.  *See Busey*, 79 F.3d at 1261 (finding that suit under APA was not implicitly precluded by the CAA in part

because "the APA provides a right of review of agency decisions precisely where a plaintiff's claim is not covered by the citizen suit provision of the substantive act.").

### 3. PM2.5 Conformity Determination

The Court is presented with an issue that appears to be a novel one with respect to the implementation of the CAA conformity requirements that govern the approval and funding of major highway facilities. §7506(c).[15]

The crux of Plaintiffs' argument under the CAA lies in the fact that the Defendants did not make the required PM2.5 conformity determination using the criteria and procedures as prescribed in 42 U.S.C. 7506(c)(4)(B) and as set forth by the EPA's Hot-Spot regulation in 40 C.F.R. 93.123. *See* 71 Fed. Reg. 12467.   Specifically, Plaintiffs assert that the Defendants did not make the required *quantitative* calculations with regard to the hot-spot analysis of PM2.5 found under the "General Requirements" in § 93.123(c).

Defendants, on the other hand, argue that they followed and relied on the Qualitative Guidance ("Guidance")[16] document that was jointly issued by the EPA and DOT, which did meet the "General Requirements" of 93.123(c).   They contend that this section does not require the quantitative calculations that Plaintiffs insist; rather, compliance with this section is deemed satisfied through *qualitative*, not *quantitative*, means as described in the Guidance.  The Defendants maintain that they worked very closely with the EPA, SHA, and interagency partners to ensure that

---

[15] There have been no cases, as of the date of this opinion, that have interpreted the recent conformity analysis after the EPA's March 2006 rulemaking.  There has been one case, *City of South Pasadena v. Slater*, 56 F.Supp.2d 1106 (C.D. Cal. 1999), which dealt only with PM10 conformity analysis.  The current regulations for PM2.5 and the ones that are in issue here, 93.123(c), had not been established yet at the time of that decision.  The Court has also diligently searched the academic community for scholarly articles, treatises, and other secondary sources but was unable to find any meaningful commentary addressing the recent conformity analysis.

[16] Qualitative Guidance is found at FHWA 157047-157082.

Conformity Determination[17] for the ICC conformed to the Qualitative Guidance and also met the transportation conformity regulations.

On March 10, 2006, EPA published a final rule that established the transportation conformity criteria and procedures for determining which transportation projects must be analyzed for local air quality impacts in PM2.5 and PM10 nonattainment and maintenance area. 71 Fed. Reg. 12468.  In this rulemaking, EPA made clear that a qualitative analysis would be required for PM2.5 analysis, stating that "areas will be required to carry out qualitative analyses until such time as EPA announces in the Federal Register that quantitative analysis requirements are in effect. The quantitative requirements will not be put into effect until after the EPA releases appropriate modeling guidance . . . ." 71 Fed. Reg. at 12480; 40 C.F.R. 93.123(b)(4) ("Where quantitative analysis methods are not available, the demonstration required by §93.116 … must be based on a qualitative consideration of local factors.").  It also ruled that it was extending the "General Requirements" of 93.123(c) to the PM2.5 analysis.

From a plain reading of the regulation (and the rule-making), it is clear that a qualitative analysis should be performed for PM2.5 and that the Guidance should be followed.[18]  The parties do not dispute the fact that a qualitative analysis is required here for PM2.5, since EPA has not issued any guidance regarding a quantitative analysis and since current models for localized PM2.5 are not accurate for adequately measuring its effects. 71 Fed. Reg. 12490.  Also, the Plaintiffs do not contend that the Conformity Analysis is not inconsistent with the Guidance.

However, what is unclear in the regulation at this point is whether the qualitative analysis includes additional quantitative calculations.  Plaintiffs argue that there are additional quantitative

---

[17] The Conformity Determination is located in Attachment H of the ROD.

[18] "[Q]ualitative PM$_{2.5}$ hot-spot analyses should be completed according to joint EPA and DOT guidance." 71 Fed. Reg. 12471.

calculations located in the "General Requirements" of 93.123(c) that must be performed, while Defendants maintain that these calculations can be completed through a "qualitative consideration of local factors," as set forth in the Guidance. Essentially, the issue for the Court to determine is whether the "General Requirements" can be interpreted as having both a *qualitative* and a *quantitative* meaning, such that by following the Guidance and performing a qualitative analysis, the provisions in the "General Requirements" are satisfied.

*Weight of the Guidance*

The Court begins with the proposition that substantial deference must be given to an agency's interpretation of its own regulations. *Thomas Jefferson University v. Shalala***,** 512 U.S. 504, 512 (1994); *Dist. Memorial Hosp. of Southwestern North Carolina, Inc. v. Thompson*, 364 F.3d 513, 518 (4th Cir. 2004). Also, the Supreme Court has stressed that judicial deference to an agency's interpretation "is warranted only when the language of the ;6438;6438regulation is ambiguous." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000); *see also Auer v. Robbins,* 519 U.S. 452, 462-63 (1997); *Humanoids Group v. Rogan***,** 375 F.3d 301, 306 (4th Cir. 2004) ("[W]hen an agency interprets its own regulation, as opposed to a statute, *Auer* deference applies."). The obligation of the Court is not to decide which among those competing interpretations best fulfills the regulatory purpose; rather the Court must give "controlling weight" to the agency's interpretation "unless it is plainly erroneous or inconsistent with the regulation." *Id.* (internal quotations omitted); *Humanoids Group*, 375 F.3d at 305. In other words, the Court must defer to the agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Id. (quoting Gardebring v. Jenkins,* 485 U.S. 415, 430 (1988)). Furthermore, with regards to scientific matters, broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical

regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697 (1991)

The Court notes at the outset that since the Guidance is the Agency's attempt to elucidate a regulation and not a statute or an action pursuant to notice and comment rulemaking, *Chevron* does not apply. *United States v. Mead Corp.,* 533 U.S. 218, 234 (2001); *Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n,* 212 F.3d 1301, 1304 (D.C. Cir.2000) ("[A]gency interpretations that lack the force of law . . . do not warrant *Chevron*-style deference when they interpret ambiguous *statutes* but do receive deference under *Auer* when interpreting ambiguous *regulations.*") (internal citations omitted).  Additionally, an agency's interpretation of statutes and its regulatory scheme "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort to for guidance."  *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944).

As the Supreme Court stated in *Skidmore:*

> The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.*

Plaintiffs argue that the Court owes no deference to the Guidance because it was not available when the FHWA developed the Conformity Determination, meaning that the Defendants could not have relied on it.[19]  Second, the Guidance was not adopted through notice and comment rule-making.

---

[19]  The Conformity Determination was issued on March 24, 2006, and the Guidance was publicly available on EPA's website on March 29, 2006.

The Court finds Plaintiffs' arguments unconvincing.  First, the fact that the Guidance was not adopted until after the Conformity Determination was issued does not necessarily mean that the Guidance was a pretext for the Conformity Determination.  The Guidance was not solely created for the ICC project, but applies nationally to all transportation projects that are required to perform a PM2.5 or PM10 hot-spot analysis.   Secondly, the experts at EPA and FHWA, the same agencies who promulgated the rule and who issued the Guidance, also worked with the Defendants to ensure their compliance with the statute.

As Plaintiffs correctly point out, the Guidance is not legally binding since it was not issued by notice and comment rule-making. *Mead*, 533 U.S. at 226.  However, Courts still can give deference to agency interpretations of its regulations under *Skidmore* and *Auer*. *See Auer*, 519 U.S. at 461 (reasoning that an agency's or Secretary's test to interpret a regulation is controlling unless otherwise plainly erroneous or inconsistent); *see Christensen*, 529 U.S. at 588 (holding that when the regulation is ambiguous the agency's own interpretation of its regulation is entitled to deference under *Auer*); *Humanoids,* 375 F.3d  at 306.  If the regulation is not ambiguous then deference under *Auer* is not warranted. *Christensen*, 529 U.S. at 588.  Since the Court has determined that the regulation in 93.123(c) is ambiguous with regards to whether a qualitative or a quantitative analysis should be done, *Auer* deference is appropriate.  In this regard, the Guidance should be afforded its due weight as complying with the regulations.

The Guidance is meant "to guide," to assist national, state, and local authorities on how to be in compliance with the regulations.  It is a 33-page document that explains the requirements of the hot-spot regulation in a question-and-answer format.  The Guidance specifically refers to the "general analytical requirements for PM2.5 and PM10" in section 93.123(c) as well as the explanations in the published rulemaking. 71 Fed. Reg. 12496-97; Guidance at 14.  The Guidance

continues by listing the two methods that can be used to perform a qualitative analysis – those being the "comparison to another location with similar characteristics" and the "air quality studies for the proposed project location." Guidance at 17.   The next section lists the type of information that should be documented to "justify the conclusion that a proposed project meets conformity hot-spot analysis requirements in 40 C.F.R. 93.116 and 93.123." *Id*. at 18.   This list includes, among others, a "description of existing conditions pertaining to the project," a "description of the changes in these factors that will result from the project for future scenarios," and a "description of the analysis year(s) that is examined." *Id.* The final two sections address factors that could be used in describing existing conditions and the changes in existing conditions for future evaluations. *Id.* at 19-21.   To assist those entities that are required to perform these analyses, the Guidance even contains examples of Qualitative PM2.5 and PM10 Hot-Spot Analyses. *Id*. at 26-30.

In considering the Guidance as a whole and taking into account the "General Requirements" of section 93.123(c), the Court, reading these directives together, finds that the Qualitative Guidance satisfies the requirements of the regulation.   The purpose of the Guidance was to assist state and local agencies to meet the final rule's hot-spot analysis requirements.   The EPA and FHWA issued the regulations and subsequently reference this Guidance in the rulemaking for entities performing these analyses.   Nowhere in the "General Requirements" section of section 93.123(c) does it state exactly how these calculations are to be done, i.e. qualitatively or quantitatively; but, with the issuance of the Guidance, the Agencies made the informed decision that this qualitative analysis would meet the requirements of the regulations and the statute.   Since an agency of experts, like the EPA and FHWA, has interpreted its own regulations in the form of the Qualitative Guidance, from the reasoned and thorough analysis of its rulemaking "giving it the power to persuade," it must be given deference. *Auer*, 519 U.S. at 462; *Skidmore*, 323 U.S. at 140.   As a result, reading the

regulations as a whole and in their most consistent light, the Court concludes that the "General Requirements" of section 93.123(c) are satisfied not with the quantitative calculations as put forth by Plaintiff, but by a qualitative consideration of local factors using the Guidance issued jointly by EPA and FHWA.

Having set forth the framework of how the Court will view the weight of the Guidance, the Court will now address Plaintiffs' arguments. Plaintiffs make several arguments, but the Court will classify them into five main points. First, Plaintiffs argue that the "monitor comparison method" the Defendants used as the basis for the Conformity Determination fundamentally conflicts with EPA's hot-spot rule. Second, Plaintiffs contend that Defendants did not perform any of the requisite calculations, such as the current baseline concentrations at the receptor sites, future concentrations, or use emissions factors in their analysis. Third, Plaintiffs argue that Defendants did not determine the compliance with the statutory conformity tests in Sections 7506(c)(1)(A) and (B)(iii). Fourth, Plaintiffs argue that NEPA applies to this decision and therefore requires that the Conformity Determination should have been included in the EIS. Lastly, Plaintiffs argue that Defendants did not disclose or make available to the public the information used for the Conformity Determination and allow the required 45-day comment period.

*1.*

Plaintiffs argue that the Defendants' use of the "monitor comparison method" fails to provide the necessary data to perform the calculations under the rule. They maintain that the data acquired from these monitors is not relevant data because the reliability, precision, and scientific credibility of the method EPA required by the regulation is much greater than the method applied by Defendants.

The "monitor comparison method" – also known as comparison to another location with similar characteristics – is an approach, somewhat simplified, that can be used to demonstrate "that a new project will meet statutory conformity requirements."[20] Guidance at 17.  Basically, this method involves "reviewing existing highway or transit facilities that were constructed in the past and built in locations similar to the proposed project and, whenever possible, near an air quality monitor (a surrogate) to allow a comparison of PM2.5 or PM10 air quality concentrations." *Id.*  In order to locate an appropriate monitor to use as a surrogate, an "interagency consultation process" is done to determine the reasons for choosing a particular monitor, including the limitations, i.e. similarities and differences, "between the surrogate and proposed project and location." *Id.*

Through the interagency consultation, the Defendants determined that the appropriate monitor for the analysis was the Muirkirk monitor.  This was found to be an appropriate "surrogate" monitor for worst case scenarios of truck and traffic locations because the monitor had "the most similar characteristics to the traffic impact and percent trucks for the proposed ICC compared to all the monitors in the nonattainment area." Conformity Determination at 10-11.  The Muirkirk monitor was also located within the ICC project study area and was downwind of I-95 and US-1.[21] *Id.* at 6.

There are a total of thirteen monitors in the Washington, DC-MD-VA PM2.5 metro nonattainment area: four in the District of Columbia, five in the Commonwealth of Virginia, and four in the State of Maryland.  Based on the 2005 air quality monitoring data, only three of the monitors exceeded the annual mean PM2.5 standard of 15.0µg/m$^3$, none being in the State of Maryland.  Also, none of the monitors exceeded the 24-hr PM2.5 standard of 65.0µg/m$^3$.[22] Conformity Determination at 6.  The Muirkirk monitor was showing PM2.5 concentrations at 49%

---

[20] The second method that is also recommended by the Guidance is an air quality study.

[21]  The Baltimore-Washington Parkway was also included in the traffic impact volume due to its proximity to the monitor. Conformity Analysis at 6.

[22] "µg/m$^3$"denotes micro-grams per cubic meter.

of the 24-hour standard and 89% of the annual standard.  The Muirkirk monitor was the closest monitor to the study area, and it was determined through consultation and documentation that this monitor was to be used as a surrogate. Conformity Determination at 6-7.  As a result, the data obtained from this monitor was relevant since it was chosen to be used in the Conformity Determination based on the suggestions from the Guidance and the consultation process.

Plaintiffs put forth evidence in their briefs and reiterated at oral argument that the placement of the Muirkirk monitor does not accurately measure the air quality impacts in the affected area. They mainly rely on a report prepared by E.H. Pechan and Associates ("Pechan Report"), which studied the use of black carbon particles.[23]  One of the conclusions of the report was that monitors located within 20 to 300 meters could properly measure the air impacts of particulate matter. Pechan at 7-9.  Plaintiffs basically argue that the Muirkirk monitor, being more than 1.5 miles away from the study area, could not properly or accurately measure the air quality.

The Court finds that the arguments advanced by Plaintiffs, in this respect, resonate with the Court;[24] however, the Court also notes that this evidence and similar findings with regard to black carbon were considered by the EPA in their rulemaking.  Moreover, the EPA considered more than 70 studies that looked into a wide range of studies for particulate matter concentrations near roadways in its March 2006 rulemaking. 71 Fed. Red. 12472, 12493; RTC III - 275-276, comment #865.  The EPA also acknowledged both the regional and local influence of these particles and their impacts on PM2.5 concentrations.

In the Guidance, there is no mention of a distance requirement for a monitor to be used, nor was there mention of a requirement to install additional monitors in the affected area near a roadway.

---

[23]  Measuring black carbon particles allows one to measure the impact of PM2.5 on highways.

[24]  During the hearing on October 29, 2007, the Court peppered Defendants with questions as to how comfortable they were in their calculations.  The Court, in all candor, was not totally satisfied with the responses given by Defendants on that particular question.

The Guidance only requires the use of a *nearby monitor in locations similar to the proposed project*. Guidance at 17; *see also* RTC III-255-56, comment #819.  This is what Defendants did, following the consultation and coordination of the Lead Agencies in selecting the Muirkirk monitor.  While the Court expresses some reservations with respect to the accuracy of Defendants' calculations and placement of the monitors, the data collected cannot be disregarded as irrelevant or incomplete.  As a result, the Court cannot find that the selection and use of the Muirkirk monitor was arbitrary or capricious.[25]

    *2.*

    Second, Plaintiffs contend that Defendants failed to perform any of the required calculations under the "General requirements" section of 93.123(c).  Their argument is that the hot-spot analysis must estimate future PM2.5 concentrations at appropriate receptor locations in the vicinity of the project, taking into account both background levels and emission from the project.

    Section 93.123(c)(1) provides that "[E]stimated pollutant concentrations must be based on the total emissions burden which may result from the implementation of the project, summed together with future background concentrations."  It goes on to require that the "total concentration must be estimated and analyzed at appropriate receptor locations in the area substantially affected by the project." 40 C.F.R. 93.123(c)(1).

    In general, the "General Requirements" section in 93.123(c) should be interpreted in a manner that is consistent with the basic distinction that has been drawn by the agency, qualitatively and quantitatively, and as the Court has construed the regulations with the Guidance.  The EPA has

_____

[25]   The Plaintiffs also refer to EPA's monitor siting guidance as well as Appendix W (Guideline on Air Quality Models) at 40 C.F.R. Part 51.  This provision  is not applicable because to PM2.5 because Appendix W is only referred to in 40 C.F.R. 93.123(a), which address the analysis for CO and not PM2.5.  Lastly, Plaintiffs refer to a settlement agreement that was reached in the US 95 litigation, which stipulated that monitors should be placed within 1,000 meters of a highway. *Sierra Club v. FHWA*, No. 04-16155 (9th Cir. 2005).  This settlement agreement is not part of this record and thus is not considered here. *Florida Power & Light Co. v. Lorion*, 470 U.S. at 743 – 44.

summarized the requirements of 93.123(c) and provided the methods that they deem will fulfill the intent of 93.123(c) in the context of a qualitative analysis.  This qualitative estimation is done by drawing inferences based on data from an existing monitor and a thorough consideration of local factors.  Even though this is not as precise as a quantitative calculation, it is the method which was prescribed by the EPA in the Qualitative Guidance to comply with the regulations.

The Guidance provides that existing conditions should be accurately described. Guidance at 19.  It also states that any factors that may influence PM2.5 or PM10 concentrations in the proposed area should also be described and any projections of how they might "change over time with the addition of the proposed project." *Id.*  This is the method that EPA has chosen for entities to perform through consultation with EPA and FHWA, did exactly this.  While Plaintiffs would have preferred them to do a little more, the Defendants cannot be in violation by relying on the advice of the agencies who issued the Guidance.  Defendants did describe these local factors and how they would be impacted by the proposed project. Conformity Determination at 6-7.  Thus, the Court does not find that it was arbitrary or capricious for Defendants to rely upon the Guidance for making this determination.

Similarly, the Plaintiffs argue that Defendants were required to calculate "future background concentrations by multiplying the current background by the ratio of future to current traffic and the ratio of future to current emission factors." 40 C.F.R. 93.123(c)(2).  Defendants, on the other hand, argue that the term of the statute contains the permissive language "should" in the second sentence, which means that those calculations are discretionary and not mandatory.

The Court disagrees with Defendants' "permissive"  interpretation of the regulation, primarily because of the mandatory language in the first part of the 93.23(c)(2).  Nevertheless, the Conformity Determination did include a section analyzing the "Future Scenarios" of PM2.5 in the

years of its operation.  The Court, in keeping consistent with the overall Guidance interpretation of

the qualitative consideration of local factors, does not find that an actual numerical calculation of

future concentration was required to be performed, considering that reliable quantitative methods

are not available.

In estimating the future background concentrations, the Defendants used the data from the

monitors and combined that with the information on regional trends of declining PM2.5 emissions

levels.  The emissions factors that are referenced in 93.123(c)(2) refer to emissions factors which

are generated by the current air quality model MOBILE6.2.  This model, as EPA has stated in its

rule-making, is only valid at a regional level, and not valid for a localized hot-spot analysis of

PM2.5. *See* 71 Fed. Reg. at 12498.  As a result, these calculations could not and should not have

been completed.  Moreover, the Qualitative Guidance does not discuss the use of emissions factors

in prescribing a method for determining the future estimated air quality. *See* Guidance at 19-20.

In the Conformity Determination, Defendants describe the future scenario of the impact of

the proposed project.  The PM2.5 annual emissions from direct on-road mobile sources are expected

to decrease by 56% in 2010 from a 2002 baseline and emissions rates from vehicles would fall by

fifty percent between 2010 and 2030. *Id*. at 7.  The Court finds that the Defendants followed the

Guidance and properly described the future conditions and its impacts.

*3.*

Third, Plaintiffs argue that Defendants have failed to determine compliance with the statutory

conformity tests in Sections 42 U.S.C. 7506(c)(1)(A) and (B)(iii).  These requirements state that a

project must demonstrate "conformity to an implementation plan's purpose of eliminating or

reducing the severity and number of violations of the NAAQS," 42 U.S.C. §7506(c)(1)(A), and that

such activities will "not cause or contribute to any new violation of any standard in any area;

increase the frequency or severity of any existing violation of any standard in any area; or delay timely attainment of any standard or any required interim emission reductions or other milestones in any area." 42 U.S.C. §7506(c)(1)(B).

Plaintiffs seem to be suggesting that there are additional statutory conformity determinations to those that are provided in all the other applicable conformity regulations. But, Plaintiffs also concede that if the Court affirms the Conformity Determination that project emissions will not contribute to violations in the hot-spot locations, the failure to find compliance with additional statutory conformity is harmless error.[26] Since the Court has already found that the Conformity Determination was appropriate in that there would be no violation of NAAQS with the construction of the ICC, Plaintiffs' challenge on the statutory conformity tests fail.

Moreover, EPA addressed this very point that Plaintiffs are arguing in the March 2006 rulemaking. Section 93.116(a) of the regulations specified the findings that are required in a project-level conformity determination when a hot-spot analysis has been conducted. EPA's response to comments showed that EPA specifically intended for the findings in section 93.116(a) to satisfy the CAA requirements, without the need for an additional finding that each individual project will not "delay" timely attainment. 71 Fed. Reg. 12482. In its rulemaking, the EPA responded that

> [t]hat the statute does not require an individual transportation project to reduce emissions by itself. Individual transportation projects are not required to reduce all transportation-related emissions; they need only prevent worsening air quality concentrations. So long as the air quality standards are not impacted by a new project, the project will meet all applicable statutory requirements by not causing or contributing to new violations, not increasing the severity of existing violations, not interfering with timely attainment and interim progress, and being consistent with the overall purpose of the SIP to eliminate all violations." *Id*.

---

[26] Plaintiffs concede this point in their Reply brief, p. 36. (Doc. No. 62).

It has been determined in the Conformity Determination that there would be no violations of the PM2.5 standards in the year 2010, which is the year that emissions from the proposed ICC are expected to be at its highest and the attainment deadline for the Washington, DC-MD-VA nonattaintment area. Conformity Determination at 10.  The emissions from the proposed ICC, when factored in, would not currently violate the PM2.5 standard nor were they expected to violate the PM2.5 attainment deadline.  Thus, the statutory criteria were satisfied and no additional findings or determinations, as Plaintiffs suggest, need to be met, as they are already deemed to be in compliance with section 93.226(a).

   *4.*

Plaintiffs next argue that NEPA applies to the Conformity Determination and that the Conformity Determination is the kind of agency decision that must be included in an EIS; therefore, Defendants were under an obligation to prepare a supplemental EIS and include this determination. In support of their position, Plaintiffs alerted the Court to a 2005 amendment to the Federal-Aid Highways Act ("FAHA"), 23 U.S.C. § 139.  Plaintiffs brought this statute to the Court's attention over two months after Plaintiffs' submitted their initial brief concerning the Conformity Determination and only minutes before the final hearing before the Court.  Under section 139(a)(3)(A), an "environmental review process" includes the process for and completion of any environmental permit, approval, review, or study required for a project under any Federal law other than the NEPA.

Although the Court recognizes that it can take notice of binding law regardless of whether a party entered the law into evidence, *see Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991), Plaintiffs have not provided the Court with any authority to support their argument that section 139 applies in this situation.  The Court does not believe that there is any language in section 139 that

is inconsistent with what has already been presented before the Court.  Moreover, the Court recognizes that section 139 was amended in 2005 and takes note of Defendants' argument that Section 139 only applies where an EIS was initiated after the statute was enacted in August 2005.[27] It seems logical to the Court that this 2005 amendment would not apply here to a study that was initiated in 2003, more than two years before the statute was enacted.  The Court reiterates that section 139 does not present any inconsistency that would require to Court to reevaluate its analysis regarding the Conformity Determination.  Therefore, the Court finds that section 139 does not apply to Defendants' Conformity Determination under these circumstances.

5.

Finally, Plaintiffs argue that Defendants did not disclose and make available to the public the information used to make the proposed Conformity Determination or provide the minimum 45-day comment period.  Plaintiffs allege that Defendants released the Conformity Determination without publishing notice of its availability in the Federal Register.  Plaintiffs also noted that there was no public record containing the data sources and documentation on which Defendants relied, which prevented Plaintiffs from conducting their own conformity analysis under Section 93.123(c).[28] Therefore, Plaintiffs argue that the comment period should not have begun until after Defendants released the necessary information on April 19, 2006.

Section 93.105(e) requires that an agency provide "reasonable public access to technical and policy information . . . at the beginning of the public comment period."  40 C.F.R. § 93.105(e).  The record indicates that the Conformity Determination was released for public comment on March 24, 2006.  *See* FHWA 183022.  This publicly available information, according to Defendants, provided

---

[27] *See* http://www.fhwa.dot.gove/hep/section6002.htm for an interpretation of the application of the amendment.

[28] Defendants provided the data after Plaintiffs submitted a letter to Defendants requesting such information.

information about the quantitative and qualitative data underlying the regional analysis conducted. *See id.* Defendants argue that this information was adequate, and that the technical information requested by Plaintiffs was not relevant to Defendants' Conformity Determination because the information requested was related to a quantitative conformity analysis, which Defendants argue is not required under Section 93.123(c).

The Court has already agreed with Defendants and determined that a quantitative analysis is not required under section 93.123(c). Therefore, the Court is not inclined to believe that the information requested by Plaintiffs should have necessarily been included in the "technical and policy information" referred to in Section 93.105(e). The Court also believes that the record indicates that Defendants provided the public with adequate information on the Conformity Determination, at least enough to satisfy the mandates of the regulation. Therefore, the Court finds no violation with respect to the conformity rule in Section 93.105(e).

Lastly, the Court agrees with Defendants that the applicable conformity regulations do not specify a minimum comment period nor does it mention any specific requirements for the length of a comment period. *See* 40 C.F.R. §93.105(e) (providing no specific requirements for the length of the comment period). The record reflects that Defendants initially provided the public with a fifteen-day comment period on the fourteen-page Conformity Determination and extended that period to an additional fifteen (15) days (totaling thirty-three days with the weekends). *See* ROD at 86. The Court finds that the thirty-three day public review and comment process was sufficient to satisfy the mandates of Section 93.105(e).

### E.   Section 109(h) of the Federal-Aid Highways Act ("FAHA")

Environmental Defense Plaintiffs bring a claim under the Federal Aid Highway Act ("FAHA"), 23 U.S.C. §101 et seq. They claim that the FHWA violated section 109(h) by failing

to make a legally adequate determination that the proposed ICC is in the best overall public interest. The applicable statute sets out guidelines to determine what is in "the best overall public interest."

FAHA provides the statutory basis for the Federal-Aid Highway Program of financial assistance to states for mass transportation construction and improvement projects. The FAHA is administered by the FHWA and sets forth certain requirements that projects must satisfy in order to be eligible for federal funding. Specifically, 23 U.S.C. §109(h) states in part that the Secretary of Transportation shall:

> promulgate guidelines designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project *are made in the best overall public interest*, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following:
>> (1) air, noise, and water pollution;
>> (2) destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;
>> (3) adverse employment effects, and tax and property value losses;
>> (4) injurious displacement of people, businesses and farms; and
>> (5) disruption of desirable community and regional growth.

(Emphasis added).

Compliance with the requirements of 23 U.C.S. 109(h) is to be determined by examining whether the FHWA regulations implementing both NEPA and section 109(h) have been followed. Namely, these regulations require FHWA to conduct its section 109(h) analyses as part of the NEPA process. 23 C.F.R. 771.105(a); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 184, 186 (4th Cir. 1999); *Sierra Club v. Dep't of Transp.*, 310 F.Supp.2d 1168, 1204 (D. Nev. 2004).

Section 109 is a general policy statement which does not imply a private right of action.

86

*Jersey Heights Neighborhood Ass'n*, 174 F.3d at 186.  Plaintiffs may, however, challenge FHWA's

actions under the APA. *Id.*  As stated previously, the Court may not overturn an agency's decision

under the APA unless the decision was "arbitrary, capricious, an abuse or discretion, or otherwise

not in accordance with law." 5 U.S.C. §706(2)(A).

In arguing that the Defendants did not make the requisite public interest showing, Plaintiffs

contend that section 109(h) imposes a substantive duty on Defendants, namely requiring a separate

process, to ensure that the Selected Alternative is in the best overall public interest based on the

consideration of the relevant factors defined in the statute.  Plaintiffs further maintain that this duty

cannot be satisfied by mere compliance with the general procedural requirements of NEPA.  Second,

Plaintiffs argue that the Defendants have not considered the relevant factors defined under section

109(h) and its implementing regulations.  Plaintiffs allege that Defendants have not explained the

basis for their determination that the proposed ICC is in the best overall public interest.  As a result,

Plaintiffs argue that Defendants' actions and decisions were arbitrary and capricious under the

statute.  For the reasons set forth below, the Court finds that Plaintiffs' arguments fail.

*1. Independent Process/Substantive Determination*

The regulations in their current form, as set forth above, require neither a separate analytical

process nor an independent assessment for compliance with section 109(h).  They do not establish

any standard for consideration of alternatives in the section 109(h) process apart from what is

required under NEPA's implementing provisions.

Plaintiffs argue that Defendants did not follow the statutory mandate of its regulations in not

performing a separate public interest determination as part of section 109(h), but this claim is

without merit.  The regulations specifically point out that

"[C]urrent NEPA procedures as implemented by the FHWA assure that SEE [social, economic, and environmental] factors, including public involvement, are well integrated into the highway decisionmaking process from project planning through construction. Basically, the NEPA process provides a framework for the highway project development process.  Interwoven into the entire process are extensive steps to evaluate the SEE effects.  This process is now being effectively used to assure that both NEPA and section 109(h) requirements are being met throughout all the highway project development states." 47 Fed. Reg. 21781.

Incorporating section 109(h) into the NEPA process does not imply that there are separate requirements under section 109.  Neither has the FHWA provided that the requirements of section 109 impose additional obligations outside the regulations that implement them.  The Agency has made it clear that section 109 is to be complied with through NEPA regulations. 47 Fed. Reg. 21782. FHWA's interpretation of its own regulations, including section 109(h), is entitled to substantial deference. *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 168 (4th Cir. 2000)*; Sierra Club*, 310 F.Supp.2d at 1207.  Plaintiffs have not cited any authority to support its contention that section 109(h) requires an individualized and independent process regarding best overall public interest.  Its attempt at seeking to overturn almost three decades of consistent FHWA practices is unfounded.

What is required for the "public interest" determination is for the Agency to consider how the proposed project will impact the social, economic, and environmental effects on the surrounding community.  The "best overall public interest" provision is a policy consideration that underlies the entire evaluation process.  Specifically, the ROD is to contain "an explanation of the balancing of values underlying the Federal decision on the project reviewed under NEPA." 47 Fed. Reg. 21781. This statement is reiterated in the "Introduction and Summary" of the ROD stating the agency's responsibility to design and choose a project in the best overall public interest.

Plaintiffs also suggest that the Defendants did not follow the language of the regulations in the decisional documents for the project, but this suggestion is likewise misplaced.  Again, it must be noted that the ROD itself is a decision that the selected alternative is in the "best overall public interest."  This carries forth with it the Defendants' explanation in the FEIS that "the final decision regarding selection of an alternative, which will be made in a Record of Decision, will consider all this information to ensure that a decision is made in the best overall public interest." FEIS, Vol. 1 at S-46.  There are many other references to this "public interest" determination: a consideration of disruption of desirable community and regional growth (ROD at 55);[29] consideration of section 109(h) in conjunction with the section 4(f) determination (ROD at 89); and also the statement concluding that Corridor 2AX was imprudent, since "FHWA has taken into account the mandates of Section 109(h) . . ., which requires FHWA to reach a project decision that is in the best overall public interest taking into account the need for safe, fast, and efficient transportation, public services, and the costs of eliminating or minimizing adverse natural environmental community effects." ROD at 117.  The statute requires that these factors are considered and taken into account, and this Court is convinced that this is what Defendants did.

Plaintiffs may have been looking for "magic words," (e.g. "The project is in the best overall public interest because ..." ) but recitation of these "magic words" were not required to comply with the statute and make the public interest determination.  The Court generally will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  The ROD and the FEIS contain the explanations of why the agency made its decision to approve the project and the Selected Alternative.  The Court simply cannot impose on Defendants more than what the statute

---

[29]   This factor is reflected in 23 U.S.C. 109(h).

requires.  Nor can the Court construe sections of the provisions that are inimical to the Agency's interpretation of its own regulations.

### 2.  *Considering Factors and Impacts*

Plaintiffs make specific challenges to the consideration of relevant factors in the Agency's determination of the Selected Alternative as being in the best overall public interest.  Plaintiffs point to the fact that the agency chose the Selected Alternative without adequate support in the ROD showing that it would eliminate or minimize significant adverse social, economic, and environmental effects, including health effects, costs of travel, and air pollution. Also, Plaintiffs argue that Defendants failed to mitigate adverse impacts into the project as well as consider alternatives that best accomplish national, state, and local objectives for the area.

To the contrary, the 136-page ROD represents a decision that considered all relevant factors and was made in the "best overall public interest." ROD at 2 and *passim*.  In accordance with 23 C.F.R. §771.105(b), the Defendants evaluated alternative courses of action, ROD at 33-52; they considered the need for safe and efficient transportation, ROD at 63-68; they considered the social, economic, and environmental impacts of the proposed transportation improvement, ROD at 68-77, 131-135; and they considered national, State, and local environmental protection goals, ROD at 53-63.  Additionally, addressing the mitigation issues, Defendants discussed their mitigation plan and advised that they will commit to its implementation as well as institute a monitoring program to insure that mitigation is carried out as suggested in the NEPA regulations (40 C.F.R. §1505.3) and as stipulated in regulations by the FHWA (23 C.F.R. §771.109(b)). ROD at 1, 17-20.

Plaintiffs' next contention is that Defendants failed to consider climate change and air pollution impacts.  The record shows that Defendants *did* consider these impacts. *See* ROD at 30, 134-136; Attachment D at 19.  While most of these mitigation measures are focused on the

construction phase, they nevertheless address mitigation of air pollution for the entire project. Moreover, with air quality, as has been explained earlier, the Defendants found that there would be no new violations to NAAQS standards as a result of the ICC. ROD, Attachment H at 10.   An analysis that concludes that no mitigation is required for a particular potential adverse effect does indeed "consider" that potential adverse effect.  The record reflects that Defendants have adequately considered these potential adverse effects.

With respect to global climate change, the FHWA explained in responding to comments that the "issue of global climate change is an important national and global concern that is being addressed in several ways by the Federal government." RTC at III-124, #409.  The response went on to say that the Agency believed it was not useful to "consider greenhouse gas emissions as part of the project-level planning and development process," since there are "no national regulatory thresholds for greenhouse gas emissions or concentrations that have been established through law or regulation." *Id.*   In light of the regulations, the Court concludes that Defendants did not act arbitrarily or capriciously in concluding that no particular mitigation is needed here for the supposed impacts of a single stretch of highway on the global problem of climate change.

Plaintiffs also contest how the mitigation measures generally were not incorporated into the project as required by the regulations.  This contention is devoid of merit.  While the regulations mandate that mitigation must be incorporated, NEPA does not require any particular action to mitigate environmental impacts nor dictate which specific measure should be selected. 23 CFR 771.105(d); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989). The Defendants did incorporate an extensive mitigation package into the project, and it reflects the commitments by the agencies to see that they are actually completed.  Notably, federal funding for the project is conditioned on the implementation of these features. ROD 1, 20, Attachment E.

91

Stripped to the bare bones, Plaintiffs simply have not overcome their burden that the Defendants acted arbitrarily and capriciously in adopting the Selected Alternative.  The Court finds that the Defendants have followed the mandates of NEPA and the section 109(h) regulations in considering the environmental effects and alternatives and in the conclusion that the ICC project is in the "best overall public interest."

### F.  Environmental Defense Plaintiffs' Supplement to Complaint

On October 1, 2007, the Plaintiffs submitted a motion to the Court requesting leave to supplement their complaint to bring in additional claims (Docket No. 61).  The Court granted the motion (Doc. No. 71) with respect only to Count 39 – Defendants' failure to prepare a Supplemental Environmental Impact Statement ("SEIS") – and Count 41 – Defendants' failure to consider health effects and the revised NAAQS under section 109(h).

*I. Count 39*

A court should not set aside an agency's decision not to prepare a SEIS unless that decisions was arbitrary or capricious. *Marsh*, 490 U.S. at 377; *Hughes River Watershed Conservancy v. Glickman*; 81 F.3d 437, 443 (4th Cir. 1996).  NEPA requires agencies to take a  "hard look" at environmental consequences of their proposed projects even after an EIS has been prepared. *Hughes River*, 81 F.3d at 443.  The FHWA must prepare a Supplemental EIS whenever it is determined that changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or where new information or circumstances relevant to environmental concerns and bearings on the proposed action or its impacts would result in significant environmental impacts

not evaluated in the EIS. 23 C.F.R. 771.130; *see also* 40 C.F.R. §1502.9(c)(1) (setting forth the same standard in the CEQ regulations implementing NEPA).

Generally, agencies are to apply a "rule of reason" in deciding whether to supplement the EIS, which turns on the value of the new information still pending in the decision-making process. *Marsh*, 490 U.S. 373-74.   If there remains "major Federal action" to occur, and if the new information is sufficient to show that the remaining action will "affect the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared. *Id.; see also* 42 U.S.C. 4332(c).  Because evaluation of the PM2.5 and the air quality data analysis "requires a high level of technical expertise," the Court must defer to "the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club,* 427 U.S. 390, 412 (1976). *See also Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential").

An agency need not supplement an EIS every time new information comes to light after the EIS is finalized. *Marsh*, 490 U.S. at 373.   "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* Moreover, not every new circumstance requires a supplemental EIS. *Sierra Club v. Froehlke,* 816 F.2d 205, 210 (5th Cir.1987). Rather, "the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Id.*; *Hickory I*, 893 F.2d at 63 (internal quotations omitted).

Plaintiffs make three main challenges with regard to the SEIS.  First, they argue that there is "major Federal action" remaining in the approval of contracts for several segments of the ICC that

93

if approved, will result in significant effects on air quality and public health.  Second, Plaintiffs argue that the revised 24-hour PM2.5 NAAQS is significant new information that triggers Defendants' duty to prepare an SEIS.  Third, Defendants' failure to prepare an SEIS was arbitrary and capricious.

*A. Major Federal Action*

"Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. 40 CFR §1508.18; *see also Ross v. Fed. Hwy. Admin.*, 162 F.3d 1046, 1052 (10th Cir. 1998).  The "major Federal action" that Plaintiffs contend is still pending is the approval of the design-build contracts for Segments D and E of the ICC, which would substantially increase traffic flows in and around the I-95/ICC interchange.  But the critical decision to build the ICC has already been made, namely in the publishing of the ROD back in May 2006, and the FHWA has approved the Request for Proposals for the contracts to build Segments A, B, and C. FHWA 183622-23; 184060-61; 184025-26; *see also* 23 C.F.R. §635.112(i)(1).  In addition, Defendants note that the project agreements between FHWA and the State of Maryland have been completed, and the federally-funded portion of the ICC has been approved pursuant to 23 U.S.C. 115. FHWA 184070, 184027, 183624.

To support their position, Plaintiffs rely on the Fourth Circuit case, *Sugarloaf Citizens Association v. Federal Energy Regulatory Commission*, for the proposition that "a non-federal project is considered a 'federal action' if it cannot begin or continue without prior approval by a federal agency and the agency possesses authority to exercise discretion over the outcome." *Sugarloaf Citizens Ass'n v. Fed. Energy Regulatory Comm'n*, 959 F.2d 508, 513-14 (4th Cir. 1992). This test is not necessarily applicable since the FHWA has given its approval for Segments A, B, and C regardless of whether approval of the final two segments will be granted by the FHWA.  Even

though the contracts for Segments D and E have not yet been approved, these final two segments of the ICC will not prevent the previous three sections from being built.  In fact, the record indicates that Segments D and E comprise less than ten percent of the entire ICC project. FHWA 185370.

Defendants note that the final two segments could be potentially built without the use of federal funds, thus rendering the approval of the FHWA unnecessary.  However, simply using state funds instead of federal funds for the final segments of a project that has a significant amount of federal involvement would not relieve the state of its federal obligations.  *Ross*, 162 F.3d at 1052. Notwithstanding this, the Court does not believe that approval of the remaining Segments, D and E, rises to the level of "major Federal action."

The record indicates that approval for the ICC has already been given, and thus, the Court cannot find that there is still "major Federal action" pending.  Further, it is doubtful that the FHWA would give its approval for a project and allow construction to begin only to rescind that approval later with a partially completed road.  Since there remains no "major Federal action" for the ICC requiring supplementation, FHWA's obligation under NEPA was satisfied. *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 73 (2004) (holding that while the approval of a land use plan is a major federal action, that action is completed when the plan is approved).

*B. New information of circumstances*

Plaintiffs' next argument is that a SEIS was required to consider the impacts of the revised 24-hr NAAQS for PM2.5 and to evaluate the new health studies related to MSAT emissions.  As has been stated earlier, EPA revised the 24-hour PM2.5 level from $65\mu g/m^3$ to $35\mu g/m^3$ in light of new information new information linking the health impacts of short-tem exposure to fine particulate matter.  EPA announced this new standard in a rulemaking in March 2006, which went into effect in October 2006.  Defendants are still under the 1997 standard of $65\mu g/m^3$ since the FEIS was issued

in January 2006, and accepted in June 2006.  The ROD was issued by the FHWA on May 29, 2006,

several months before the revised PM2.5 standard went into effect.   EPA thereafter issued a

guidance memorandum on June 25, 2007, to all regional EPA coordinators discussing EPA's

interpretation of the new standard. FHWA 184787.  Specifically, the letter mentioned that for

projects that had completed the NEPA process but had not already been implemented, agencies

should "*consider the revised PM2.5 NAAQS to assess whether supplementation would be*

*appropriate.*" *Id.*[55]

Plaintiffs submitted a petition for a SEIS to Defendants on June 13, 2007, presenting

information in three areas, that in their opinion, would necessitate a SEIS: 1) a quantitative modeling

analysis showing potential violations of the new 2006 PM2.5 standard; 2) new studies linking

exposure to roadway emissions and health impacts among sensitive groups; and 3) a study indicating

that modeling tools were available to perform a health risk assessment. Letter, M. Replogle (ED)

to N. Castellanos (FHWA) (June 13, 2007) (FHWA 184604 at 184606).

The quantitative modeling analysis was completed by E.H. Pechan and Associates ("Pechan

Report") and showed that the impact of PM2.5 emissions from projected traffic in 2012, after the

opening of the ICC, would at least double the ambient impact as compared with the No-Build

Alternative. "Air Quality Modeling Analysis of PM2.5 Emissions from the Proposed ICC" (June 12,

2007), at 16-20 [FHWA 184678-82].   Plaintiffs also submitted medical reports from Dr. John

Balbus, M.D., entitled "Summary of New Scientific Literature Documenting Adverse Health Effects

in People Exposed to High-Traffic Roadways" (May 24, 2007) [FHWA 184642].   Additionally,

---

[55]    The process for implementing the 2006 PM2.5 standard is in its early states.  As of this opinion, the
EPA has not yet designated non-attainment areas for the new standards.  Final non-attainment designations for the
revised 2006 PM2.5 standard will be made no sooner than December 2008, with an effective date in early 2009.
Furthermore, conformity requirements will not apply until one year after the effective data of non-attainment
designations.  *See* http://www.epa.gov/oar/particlepollution/naaqsrev2006.html#timeline for implementing schedules
of the 1997 and 2006 standards.

Plaintiffs submitted information from the Gauderman Report, which discussed the relationship between children suffering from impaired lung development and exposure to highway pollution. FHWA 184643. Lastly, Plaintiffs referred to findings from another study done by the UCLA Center for Health Policy Research, which reinforced earlier evidence of the link between highway emissions and asthma. FHWA 184644.

In response to Plaintiffs' petition for a SEIS, Defendants commenced a Reevaluation of the project and ultimately concluded that a SEIS was not required and that a new conformity determination was not needed. FHWA considered more recent PM2.5 concentration data from the Muirkirk monitor and found that it was still in compliance with the 1997 standard, which applies to the ICC, and also in conformity with the revised PM2.5 standard. Additionally, Defendants, in response to Plaintiffs' concerns surrounding the considerable distance of the Muirkirk monitor away from a highway, reviewed additional data from other monitors which were located within 500 meters of major roadways.[56] FHWA 185387-92. The FHWA did realize that these monitors were not a "perfect match," since the amount of truck traffic is not the same as it would be for the ICC and since there were other sources of PM2.5 which were emitted by industries and power plants near those monitors. However, there is data that shows that mobile sources account for the majority of PM2.5 emissions near these monitors. FHWA at 185388. With this new data, FHWA's Reevaluation still supported the conclusions of the original Conformity Determination when the regional declining trends in the Washington, D.C. area are factored in, due to stricter vehicle emissions requirements. Reevaluation at 8.

Also, in regards to the Plaintiffs' quantitative analysis reports, the record reflects that Defendants found those analyses contradicted evidence in the record and simply disagreed with the

---

[56] The two monitors FHWA considered were the "RFK Stadium" monitor and the "Near Tidal Basin" monitor, both which are located within 500 meters of major highways.

Plaintiffs' experts because of the unreliable nature of a quantitative analysis for PM2.5.  Agencies are entitled to rely on the views and opinions of its own experts when there is conflicting expert opinions. *Hughes River*, 165 F.3d at 288.  The Court's role here is not to resolves disputes among the various experts or to make sure that decisions are made under the "best scientific methodology." *Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp.*, 42 F.3d 517, 526 (9th cir. 1994).

Lastly, in regards to the health studies and the impact of MSATs, Defendants considered more than 65 health studies related to air quality. *See e.g.,* FHWA 115015 to 115189; 115215 to 115278; 115293 to 115452; 1154696 to 116135.  It is undisputed that there are adverse health effects from PM2.5 emissions, and there have been new studies since the issuance of the ROD that expand exactly what these health effects are.  The negative health effects were disclosed in the FEIS, and the Defendants concluded that since these studies did not present a "*seriously* different picture" of the environmental impacts of the ICC project, a SEIS was not warranted.

At the outset, the Court notes that the revised standard is significant new information, since the old standard is reduced almost by half.  The EPA, the agency charged with the responsibility to recommend and enforce measures to protect our environment, determined that a lower threshold level would lessen the adverse public health effects of PM2.5.  The record reflects that Defendants reevaluated the monitor data and included additional monitors in their analysis, which ultimately supported their original conclusions in the Conformity Determination.  Also, the adverse health effects of mobile source emissions were known prior to the issuance of the FEIS and were disclosed in the FEIS.  These new studies did not present a "seriously different picture" of the environmental and health effects that were known prior to the FEIS. *Hickory I*, 893 F.2d at 63.  Therefore, after reviewing FHWA's reevaluation and conclusions, and applying the "rule of reason," the Court concludes that the FHWA did take a "hard look" at these studies and the new standard.  The Court

further concludes that Defendants' decision not to prepare a SEIS was not arbitrary and capricious, and the decision not to prepare a SEIS must be upheld. *Hughes River*, 81 F.3d at 443.

*II. Count 41*

Similarly, as stated earlier in regards to the section 109(h) claim, the NEPA requirements include the requirements under section 109(h) that a decision must be made in the "best overall public interest." 23 U.S.C. §109(h).  The record demonstrates that the health effects of the revised PM2.5 NAAQS were considered by the Defendants when they issued the ROD. FHWA at 185384. As a result, the Court finds that Defendants did not act arbitrary or capricious in determining that the ICC project was in the best overall public interest.

### G.  Prince George's County Council Amicus

The Court received an *amicus* brief submitted on behalf of a group of duly elected state, county, and municipal governmental officials (collectively "*amici*") representing constituencies within Prince George's County, Maryland. The Court also allowed them the opportunity to participate in oral argument.  The *amici* filed a motion for leave of the Court to express their concerns regarding the severe impacts of the ICC project on the County and to correct the mischaracterizations about the local land use plans from local councils and agencies.  The Court must, of course, refrain from taking a position on whether the ICC should or should not be built or whether there are alternatives that make better sense politically.  The Court's obligation is to merely ensure that the procedures mandated by these environmental statutes have been complied with.  Simply because the Council's disapproval of the ICC was not the prevailing position does not necessarily amount to a violation of the law.

The legal arguments in the *amicus* brief parallel those asserted by the Plaintiffs and are addressed earlier in this opinion.  However, the *amici* do assert three main points in addition to what

Plaintiffs have already challenged.  The *amici* argue that the Defendants failed to reconcile the inconsistencies of the ICC with the local development plans for the County; that Defendants failed to give due consideration to the elected officials objections to the ICC; and that Defendants did not consider the negative economic impacts of the ICC on Prince George's County.

First, the *amici* argue that the Defendants' failure to identify and reconcile the ICC's inconsistency with the Prince George's County land use plans violates NEPA.  The *amici* note that Prince George's County has consistently opposed the construction of the ICC, and the construction of the ICC cannot be squared with the goals and policies in the County's current General Plans and periodic updates.  Lastly, they contend that the FEIS relies on selective portions of the outdated Subregion I Master Plan of October 1990, and did not include the more recent 2002 General Plan that supplanted the goals, objectives, and policies of the Subregion I Master Plan.. FEIS Vol. 1, at II-31.[57]

The updated 2002 Master Plan for Prince George's County does depart from the strict "On Wedges and Corridors" concept, which the County had adopted until 2002.[58]  FEIS, Vol. 1, II-18. However, the Subregion I Master plan, adopted in 1990 remains the guiding document for land use in the northwestern portion of the County. *Id.* at I-27, II-28.  The General Plan and the Subregion I plan both project mixed use, high-density development in the area between I-95 and US-1.[59] Based on the visions of the general plan for Prince George's County (as well as Montgomery County) and

---

[57]  *Amici* also claim that the ICC would divert limited transportation funds away from transit priorities, such as the Purple and Yellow transit lines, that are much higher priorities for Prince George's County.  These plans are still currently in the works for the entire region, as the ICC is only one portion of a regional plan to deal with mass transit issues in the greater Washington, D.C. metro area.

[58]  The Subregion I Master Plan does not include the City of Laurel, which does support the ICC and which is the location for one of the terminus of the ICC. FEIS, Vol. 1 at II-18.  "Corridor 1 is the preferred alternate since it has the greatest consistency with the Laurel, Beltsville, and Vicinity Master Plan and provides the greatest benefits to Prince George's County." (Letter, H. Hijazi to R. Veerahachaneni, Feb. 7, 2005, FHWA 158804).

[59]  This is part of the 2-mile section of the proposed ICC roadway that will be located in Prince George's County.

relying on the specific land use, zoning, transportation, environment, and public facilities identified in local area master plans, an east-west multi-modal highway is called for to service existing development and future growth as planned in designated portions of the study area. *Id.* at I-27.

The regulations require that an EIS shall "discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. 1506.2(d). The difference between a preference and an inconsistency is significant. An inconsistency is a point of controversy, whereas a preference is choosing one option over another. Even though the ICC is not a specific project on the General Plan, the Plan does not completely exclude the building of new roads in the county. Simply because a proposed highway is not preferred or is not specifically mentioned in a General Plan does not constitute an "inconsistency" that NEPA requires to be explained in an EIS. Neither Plaintiffs nor *amici* provide support for such a rigid reading of the NEPA regulations. Also, a proposed highway is not inconsistent with a local plan even if the local plan "had shifted [its] priorities to mass transit." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175-76 (10th Cir. 2002). Prince George's County has stressed mass transit in its General Plan, but has not abandoned the building of new highways or roads. The ICC remained a part of the General Plans for the County up until 2002, and it is currently a part of the proposed plan for 2007.[60] Furthermore, the Record shows that the FHWA consulted with all agencies with jurisdictions for planning in the study area, reviewed more than fifty local and regional plans, and documented its considerations of national, State, and local environmental protection goals. ROD at 53-63.

---

[60] In August 2007, Prince George's County released a new proposed Subregion 1 Master Plan, which does include the ICC. *See* M-NCPPC, *Preliminary Master Plan and Proposed Sectional Map Amendment for Subregion I* at page 42, *available at* http://www.mncppc.org/cpd/SubRegionOne/SubOneFinal.cfm. Since this is the proposed plan and not the adopted plan for the county, it still is appearing on the radar for possible planning and development for the county.

An environmental impact statement is to discuss any inconsistency between a proposed action, but the federal regulation "does not require that [an agency] bow to local law – only that it consider it." *Glisson v. U.S. Forest Serv.*, 138 F.3d 1181, 1183 (7th Cir. 1998). Here the Defendants did consider the concerns and opposition by the *amici* in its responses to comments as well as the voices of support from agencies and elected officials in Prince George's County and stated how the ICC would further the development patterns and plans for that part of the County. *See* FEIS, Vol. III, App. R-5, pp. 1-27.

Secondly, the *amici* argue that the Defendants failed to give due consideration to the official views of the elected officials in Prince George's County who are the ones actually responsible for land use planning and development. They state the ICC is opposed by near unanimous consent among the elected officials in Prince George's County. Also, the *amici* believe that the FEIS implies that Prince George's County supports the ICC, relying on an old planning document as well as an out-of-context statement submitted in February 2005 by the Prince George's County Department of Public Works and Transportation ("DPWT"). They point out that the DPWT merely indicated that DPWT opposed Corridor 2 because of the impact on the Konterra Business Campus in Prince George's County. However, according to the *amici*, DPWT is not the entity responsible for planning in Prince George's County. Similarly, the Prince George's County M-NCPPC transportation staff commented that the No-Build alternative was the most consistent with the County's comprehensive planning. *See* Memo, February 23, 2005 (FEIS, Vol. 3, App. R-5(1)(9-13) (comment no. 62).

The record indicates that Defendants did not ignore the political opposition in Prince George's County to the ICC, and additionally, there does not appear to be unanimous consent among elected officials with regards to the ICC. The draft EIS included a copy of the Council's 2003 Resolution against any ICC build alternative. FHWA 090779-80. The County Council's comments

in response to the DEIS restated their opposition to the project but noted a preference for Corridor 1, stating that Corridor 2 was "unacceptable." FHWA 112594.  In response to the FEIS, which subsequently selected Corridor 1 as the preferred alternative, the Prince George's County Council submitted *no* substantive comments.  FHWA 147290.  The ROD addressed this issue as follows: "While the opinions of the Prince George's County Council, through resolution, has been thoroughly considered and documented, many other local, state, and federal elected and appointed officials who represent Prince George's County, including the County Executive, do support the construction of the ICC." RTC at III-3-4, comment #17.  While the County officials would prefer a lengthy and detailed response to each and every concern with the project that is most pleasing to them, that is not realistically or even humanly possible, and doubtless required under the law.[61]

Lastly, the *amici* argue that the Defendants failed to take into account the economic development impacts which would result from state reprioritization of the county's comprehensive planning policies.  They allege that the economic study sanctioned by the State and FHWA and performed by the University of Maryland, to analyze the economic impacts of the area was flawed. This study concluded that the proposed ICC would stimulate economic and business development at the Kontera Business Campus.  However, the study ignored the constrained local roadway capacity in that area and the limitations on potential zoning.  Moreover, the 2002 General Plan does not mention the ICC nor the I-95 Corridor, and Konterra is only listed as a "possible future center."[62]

---

[61] The Record also contains the many supporting views of other Prince George's County representatives, and those are included in the Record at FHWA 033923 and 099933 (House and Senate Joint Resolutions restarting the EIS process); FHWA 147541 (letter from J. Johnson supporting designation of ICC as part of National Highway System, Feb. 14, 2006); FHWA 158799 (letter from J. Johnson supporting the ICC, Feb. 9, 2005), FHWA 158803 (Letter of support from DTPW), and FHWA 090319 (Comments from Prince George's County Chamber of Commerce supporting the ICC).  Also, there are numerous community associations, including the Beltsville Citizens' Association and Calverton Citizens' Association, along with the elected Laurel City Council, that favor the building of the ICC. (Letter, J. Giannetti, Jr. to N. Pedersen, Feb. 11, 2005) FHWA 106317.

[62] A "possible future center" is defined as one that is anticipated for more intense development at some point in the future, but is not accorded any priority status for public facilities, programming, grants, loans, programs, standards, etc., until after being designated as a "Center" by the district Council in some future action, such as a biennial update, area plan, or sector plan. *See* General Plan at 106.

The District Council has not taken any steps to change Konterra's status from a "possible future center" to one that warrants prioritization for allocation of any funds.  Lastly, there is no support in the record for the assertion that Prince George's County preferred the Selected Alternative route for the ICC in order to benefit Konterra. *See* FEIS vol. 1, VII-46; *see also* ROD at 60.  Again, the *amici* argue that this statement in the FEIS was implied from a comment made by the DPTW expressing its opposition to Corridor 2.

Contrary to the suggestions by the *amici* that Konterra is some vague or remote possibility, it is clear that the Defendants did consider the Konterra site as a "New Downtown."  The vision for the new downtown area includes a variety of commercial and residential development.  FEIS, vol 1, at  II-18.   However, Defendants responded that the northern zone of Subregion I will be a continuation of existing land use patterns and in filled by land uses similar to what exists now.  The area between I-95 and US-1, the "middle zone," has been designated as a regional center, with an expectation that the land would be principally commercial, with retail, offices, and some higher-density residential development.  According to the Subregion I plan, completion of the ICC would facilitate the development of this area along I-95.  The General Plan and the Subregion I Plan both project a mixed use, high density development.  With excellent regional access it is reasonable to expect that as the County grows, such high quality development is highly probable. FEIS, vol. 1, II-31.

The Court, having previously served as an elected official in Prince George's County, understands and, indeed, has an appreciation for the concerns set forth in the *amicus* brief on behalf of the listed elected officials in Prince George's County.  But, the record unequivocally indicates that their concerns were taken into account and considered in the overall decision-making process.  In fact, the official stance of the Council and the expressed substance of their sentiments on the

proposed ICC were documented and included in the record.  In sum, the *amicus* brief submitted by the several state, county, and municipal officials, though insightful, does not present a cogent basis for the Court to enjoin the ICC project.

## IV.  CONCLUSION

The issues presented by the Inter-County Connecter (ICC) have been before federal, state, and local officials for over a period of five decades.  It is among the most important, most controversial, most complex, and most discussed transportation and environmental projects undertaken in the Washington, D.C. metropolitan area.   It is also important to note that this project has been on the planning board twice before, and each time it has been deemed unacceptable for various reasons.  What seems abundantly clear to this Court is that Defendants went back to the drawing board, recommenced their study of the proposed project, and thoroughly considered, examined, and, most importantly, corrected the deficiencies from previous failed attempts.

The litigation surrounding this project has been exceptional and well-presented, and all those involved in assisting the Court in making its decision should be commended.  Moreover, the Court is favorably impressed with the mound of evidence presented by both parties.  The Court also notes that it has, in the interest of completeness, permitted most, if not all, of the pertinent issues to be presented, within reason and with an intent to be fair to all parties.

Finally, the Court assures the parties that it has thoroughly reviewed the incredibly voluminous record produced in this case and has carefully weighed all the arguments raised by the parties, as well as the concerns lifted up by the *amici*.  It is the Court's view that the Plaintiffs have not demonstrated that the Defendants' actions were arbitrary or capricious in their decision to approve funding and construction of the ICC.  Nor, in light of the record, is the Court convinced that Defendants have violated the spirit, intent, and integrity of NEPA, Section 4(f), the CWA, the CAA,

and Section 109(h).  On the contrary, the Court believes that the Defendants have complied with the statutory and regulatory requirements and cannot conclude that Defendants' approval of the ICC was outside the bounds of "reasoned decision-making," especially considering the extensive record and the agencies' level of technical expertise and experience.  Although Defendants' actions, in some instances, may not have been a paragon of perfection, the Court, nonetheless, cannot find anything that rises to the level of a meaningful violation.  For all of these reasons, the Court concludes that there is no legal or equitable basis to prevent the Inter-County Connector from moving forward.

Accordingly, the Court will DENY Audubon Plaintiffs' Motion for Summary Judgment (Doc. No. 28), DENY Environmental Defense Plainitffs' Partial Motion for Summary Judgment on Part I of the Complaint (Doc. No. 37), GRANT Federal Defendant's Cross-Motion for Summary Judgement (Doc. No. 43) and GRANT Intervenor State Defendants' Cross Motion for Summary Judgment (Doc. No. 44).  The Court will also DENY Environmental Defense Plaintiffs' Partial Motion for Summary Judgment on Part II of the Complaint (Doc. No. 42), GRANT Federal Defendants' Cross-Motion for Summary Judgment on Part II of the Complaint (Doc. No. 49), and GRANT Intervenor State Defendant's Cross-Motion for Summary Judgment on Part II of the Complaint (Doc. No. 50).  With respect to the supplemental claims, the Court will DENY Environmental Plaintiffs' Motion for Summary Judgment on Counts 39 and 41 (Doc. No. 73) and GRANT Defendants' Joint Cross-Motion for Summary Judgment on Counts 39 and 41 (Doc. No. 76).  An Order consistent with this opinion will follow.


   November 8, 2007                                        /s/             
       Date                                      Alexander Williams, Jr.
                                               United States District Judge